WISE, Presiding Judge.
The appellant, Donald Dwayne Whatley, was convicted of capital murder for the killing of Pravinbhai Patel. The murder was made capital because he committed it *447 during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 10-2, the jury recommended that Whatley be sentenced to death. The trial court accepted the jury’s recommendation and sentenced him to death. What-ley did not file any postjudgment motions. This appeal followed.
Whatley raises numerous issues in his brief to this court. However, our initial review of the record reveals that we must remand this case to the trial court for additional action so that we may properly address one of the issues he raises in his brief.
Whatley argues that it appears that the prosecution used its peremptory challenges in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he contends that the prosecution exercised a large number of challenges to remove black venire-members, engaged in little or no voir dire examination of the black veniremembers it struck, engaged in disparate treatment of similarly situated black and white venire-members, and struck veniremembers who had nothing in common other than race. "Whatley also alleges that the Mobile County District Attorney’s Office has a history of discrimination. Therefore, he concludes that we should remand this case for a Batson hearing.
The State notes that Whatley did not raise a Batson objection at trial. Therefore, it argues that we may review his argument only for plain error. See Rule 45, Ala. R.App. P. Plain error is
“error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor, 666 So.2d 73 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor.”
Ex parte Trawick, 698 So.2d 162, 167 (Ala. 1997).
“In Batson the United States Supreme Court held that black veniremembers could not be struck from a black defendant’s jury because of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in Batson to apply also to white defendants.... The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of Batson apply to the striking of white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993).”
Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App.1995).
“The burden of persuasion is initially on the party alleging discriminatory use of a peremptory challenge to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the *448 community as a whole.’ [People u] Wheeler, 22 Cal.3d [258,] at 280, 588 P.2d [748,] at 764, 148 CaLRptr. [890,] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Bat-son, 476 U.S. at 97, 106 S.Ct. at 1723.
“3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
“4. The type and manner of the offending attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764,148 CaLRptr. at 905.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct. App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal. Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 CaLRptr. 890[905] (1978).
“6. Disparate treatment of members of the jury venire with the same characteristics; or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229,] at 242[, 96 S.Ct. 2040, [2049], 48 L.Ed.2d 597 (1976) ].
“9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. See Slappy, 503 So.2d at 354, Turner, supra.”
Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987).
Because Whatley did not raise a Batson objection at trial, the State did not have an opportunity to respond to his allegations and, if required by the trial court, to state its reasons for its exercise of its peremptory challenges. Also, the trial court, which is in a better position to evaluate such arguments because it was present during the jury-selection proceedings, did not have an opportunity to hear and rule on the allegations. Finally, based on the limited record before us, we cannot properly review Whatley’s allegations.
Nevertheless, our review of the record indicates that, if the defense had filed a Batson motion at trial raising the arguments he now raises, the trial court would have been obligated to require the prose *449 cution to state the reasons for each of its peremptory challenges. Although the State may very well have race-neutral and nondiscriminatory reasons for its challenges, we conclude that a remand for a Batson hearing is necessary in light of the many levels of judicial scrutiny that occur when a defendant is convicted of a capital offense and sentenced to death.
Accordingly, we remand this case to the trial court for that court to conduct a Batson hearing and to make written findings regarding Whatley’s allegations. If the prosecution cannot provide race-neutral reasons for its use of peremptory challenges against black veniremembers, Whatley shall be entitled to a new trial. See, e.g., Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), affd, 24 So.3d 540 (Ala.2009). The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 84 days after the release of this opinion. The return to remand shall include a transcript of the Batson hearing and the trial court’s written findings of fact.
REMANDED WITH INSTRUCTIONS.
WELCH, KELLUM, and MAIN, JJ., concur. WINDOM, J., recuses herself.

On Return to Remand

BURKE, Judge.[1]
The appellant, Donald Dwayne Whatley, was convicted of murdering Pravinbhai “Pete” Patel during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Whatley be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Whatley to death. This appeal followed.
On October 1, 2010, we remanded this case to the circuit court for that court to conduct a Batson[2] hearing and to make findings of facts concerning the State’s use of its peremptory strikes to remove black veniremembers. See Whatley v. State, 146 So.3d 437 (Aa.Crim.App.2010). The circuit court has complied with our instructions and has filed its return to remand.
The State’s evidence tended to show the following: On the morning of December 29, 2003, Kenneth McCall, an employee of Austal Crosby Joint Venture, went to his work site under a bridge in Mobile and discovered the victim’s body lying on the ground near the entrance gate to the work site. He telephoned emergency 911. The state medical examiner, Dr. Kathleen Ens-tice, testified that Patel died of “multiple traumatic injuries” that included numerous injuries to his head, neck, sternum, and shoulder. Dr. Enstice testified that the injuries to his face were consistent with a beating, that the injury to his neck was consistent with strangulation, and that the injuries to his upper body were consistent with having been run over by a vehicle. Patel’s pants, Dr. Enstice said, were around his neck. Cigarette butts were found near the victim’s body. DNA testing on one of the cigarettes matched What-ley’s DNA.
Testimony also established that Patel had been at Gabriel’s, a bar in downtown Mobile, on the evening of December 28, 2003, with another male. Joseph Jones testified that he saw Patel drive up to Gabriel’s and approach Whatley, who had *450 been standing outside the bar. The two then went inside the bar together. On January 4, 2004, Patel’s vehicle was discovered partially submerged in a large mud hole off Theodore Dawes Road. The vehicle had been set on fire. Sam Stevens of the Mobile Fire Department testified that he found an ignitable liquid behind the driver’s seat in the vehicle. Sharee Wells of the Alabama Department of Forensic Sciences testified that the substance on the floor of the vehicle was gasoline.
Officer Steve Thrower, an investigator with the district attorney’s office in Beaumont, Texas, testified that on August 4, 2006, Whatley was at the police station in Texas when Whatley told him that he had committed a murder in Mobile, Alabama, and wanted to confess. Officer Thrower read the following statement Whatley made to him:
“I know I don’t have to talk to anyone about this and no one from the police department or from the [district attorney’s] office is making me do this. I fully understand that Alabama can seek the death penalty against me but the Lord had put it on my heart to tell what I did so I’m going to tell it.
“Back in 2003 around December 29th I killed a man by the name of Pete Patel. I’m not sure what the proper spelling of his name is and I think Pete was just a nickname. But he was a man of Indian descent that owned a small motel by the name of the Budget Inn in Mobile, Alabama. On the night the murder happened, I had gone to a local gay bar there in Mobile by the name of Gabriel’s to look for someone to rob. It was there that I first met Pete. We made small talk and he hit on me for sex. I agreed to go with him and we left the bar in his car. I don’t remember what time it was but it was pretty late. To the best of my knowledge I think his car was a light green Honda. Pete was driving when we left the bar and we went to the Africatown Cochran Bridge. When we got there we got out of the car and sat on the hood. I smoked a cigarette. We were talking and he put his hand on my leg. That just freaked me out so I hit him with my fist. It knocked him down so I got up on top of him and hit him a couple of more times and then I started choking him. I thought at that point he was dead. So I took his pants off of him but he started moaning. When he did that I jumped in his car and ran over his head a couple of times. The driver’s side front tire was the tire that ran over him. I then took off in his car. I stopped about a quarter to three-eighths of a mile down the road and went through his pants. I got a couple of hundred dollars out of his wallet and threw his pants out. I took off again but just a short distance down the road I threw his wallet out. I went and bought some crack with the money I got. I then drove his car to Theodore Alabama and burned it. I started the fire with some gas I bought at a convenience store. The police never talked to me about the crime until 2005 when my DNA connected me to the crime scene. I don’t think they had enough to charge me because I was never charged and I never admitted anything to them. I would have never, if I had not been all messed up on alcohol. I’m very sorry for what I did to this man. I hope that by my confessing to what I have done will ease the pain of some of his family.”
(R. 1057-60.)
The jury convicted Whatley of murdering Patel during the course of a robbery. A separate penalty phase hearing was held. At the sentencing hearing, Whatley asserted that he should be sentenced to *451 life imprisonment without the possibility of parole for the following reasons: since he murdered Patel he had turned his life over to Christ; he grew up in a dysfunctional family marked by violence and abuse; he had a history of poly-substance abuse; he was depressed; and his substance abuse had affected his actions on the night of the murder. The jury, by a vote of 10 to 2, recommended that Whatley be sentenced to death. After the jury returned its verdict, Whatley made the following statement:
“Ladies and gentlemen of the jury, I see that few of y’all are upset. Please don’t let it weigh so much on y’all. I done a very terrible thing. Just, if you believe in God, pray. Don’t let it weigh on y’all so much because Pm the one that’s messed up. Pm the one that done wrong. Pm man enough to admit it. And the only way that I can get through something like this is by the Lord’s strength.”
(R. 1713.)
The circuit court then held a sentencing hearing and found the existence of three aggravating circumstances: (1) that What-ley had previously been convicted of a crime of violence or threat of violence, § 13A-5-49(2), Ala.Code 1975; (2) that the murder was committed while Whatley was engaged in the commission of a robbery, § 13A-5-49(4), Ala.Code 1975; and (3) that the murder was especially heinous, atrocious, or cruel as compared to other capital murders, § 13A-5-49(8), Ala.Code 1975. The court then followed the jury’s recommendation and sentenced Whatley to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

Whatley has been sentenced to death; thus, we apply the standard of review set out in Rule 45A, Ala. R.App. P., which states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
“ ‘Plain error’ has been defined as error ‘ “so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” ’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), affd, 778 So.2d 237 (Ala.2000). This Court has recognized that ‘ “[t]he plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’ Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), affd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).” Brooks v. State, 973 So.2d 380, 387 (Ala. Crim.App.), cert. denied, Brooks v. Alabama, 552 U.S. 1077, 128 S.Ct. 806, 169 L.Ed.2d 608 (2007). “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard *452 used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113,121 (Ala.Crim.App.1999), affirmed, 820 So.2d 152 (Ala. 2001), cert, denied, Hall v. Alabama, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002).

Batson Issue

I.
In Batson, the United States Supreme Court held that it was a violation of the Equal Protection Clause of the United States Constitution to remove black jurors from a black defendant’s trial based solely on their race. This holding was extended to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42,112 S.Ct. 2348,120 L.Ed.2d 33 (1992); and to gender strikes in J.E.B. v. Alabama, 511 U.S. 127,114 S.Ct. 1419,128 L.Ed.2d 89 (1994).
“[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. 476 U.S., at 96-97; Miller-El v. Cockrell, 537 U.S. [322] at 339 [ (2003) ]. It is true that peremp-tories are often the subjects of instinct, Batson v. Kentucky, 476 U.S., at 106 (Marshall, J., concurring), and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.”
Miller-El v. Dretke, 545 U.S. 231, 251-52, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).
“Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. [People u] Wheeler, 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 CahRptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
“1. The reasons given are not related to the facts of the case.
“2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
“3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck....
“4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors....
“5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the veni-re....
“6. ‘An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’ Slappy [v. State ], 503 So.2d [350] at 355 [ (Fla.Dist.Ct.App.1987) ]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror *453 showing the potentially liberal nature of the challenged juror.”
Ex parte Branch, 526 So.2d 609, 624 (Ala. 1987).
In Whatley’s case, 105 prospective jurors composed the venire. After jurors were removed for cause, both the prosecutor and defense counsel were left with 80 peremptory strikes each.[3] The State used 17 of its strikes to remove black prospective jurors and 18 of its strikes to remove white prospective jurors. The State used its 2d, 3d, 4th, and 5th strikes to remove white jurors and then rotated between striking a black juror and striking a white juror. Defense counsel used 26 of its strikes to remove white prospective jurors, 3 strikes to remove black prospective jurors, and 1 strike to remove a juror whose race was indicated as “other.” Whatley’s jury consisted of 10 whites and 2 blacks.[4]
The prosecutor gave the following reasons for removing the black prospective jurors. We have listed the jurors in the order in which they were struck by the State:
Juror P.C.[5] (No. 93) — Worked with mentally challenged individuals, has a brother who was charged with a stabbing and was acquitted, and does not believe in the death penalty because it goes against her faith to impose a death sentence.
Juror G.W. (No. 76) — Expressed reservations about the death penalty, had heard and read about the case, and had rheumatoid arthritis.
Juror L.W. (No. 85) — Knew one of the defense attorneys because he had represented her ex-boyfriend and had a family member who had alcohol and drug problems.
Juror C.C. (No. 87) — Was working on a degree in rehabilitation and counseling with an emphasis on substance abuse and mental health and dealing with criminals and putting them back into society and has a stepbrother in prison for armed robbery.
Juror C.A. (No. 1) — Worked for a local attorney and her cousin and husband had prior criminal histories.
Juror A.P. (No. 27) — Knew the defense attorney because he had previously represented the father of her child in a robbery case.
Juror J.W. (No. 16) — Indicated that she was scared and that it would be very tough for her to vote for the death penalty.
Juror M.M. (No. 26) — On her questionnaire she answered that she did not believe in the death penalty, was hesitant in individual questioning about the death penalty, indicated that she would hold the State to a higher burden of proof, believes that there are innocent people on death row, and was hesitant to impose a death sentence.
Juror B.D. (No. 34) — Husband had been at a mental hospital, nephew worked at Searcy mental-health facility, stepson has a drug and alcohol problem, and grandson was currently incarcerated for a probation violation.
*454 Juror K.J. (No. 50) — Her father and uncle were currently incarcerated for murder and attempted murder, respectively; she did not want to be put in a position of having to vote for the death penalty; and she had stayed at the Budget Inn motel, which had been owned by the victim.
Juror C.O. (No. 40) — Had hearing problems, suffered from post-traumatic stress disorder, and expressed reservations about the death penalty, suffered from a manic depression, and had a son who had been convicted of murder, and had a drug and alcohol problem.
Juror B.T. (No. 104) — Uncle was currently in prison for murder and juror had reservations about the death penalty.
Juror K.S. (No. 75) — In individual voir dire indicated that she did not believe in the death penalty and could not vote for death.
Juror S.W. (No. 66) — Had problems with his vision and other health problems and had a nephew in jail at the time of Whatley’s trial.
Juror C.H. (No. 61) — Had family members who worked in mental-health field, had two relatives who were in prison at the time of voir dire, specifically a niece had a drug problem and was in the city jail and a relative by marriage was serving time for murder.
Juror O.J. (Ño. 24) — Brother-in-law had drug problem, two friends had been charged with robbery, and he was hesitant in answering questions on the death penalty.
Juror T.P. (No. 74) — Grandfather is an alcoholic, and she was struck based on her responses to voir dire questions concerning drug use.
At the evidentiary hearing conducted pursuant to our remand instructions, the State presented the testimony of Whatley’s trial attorney. He testified that, after reviewing the juror questionnaires and the voir dire examination, “[he] did not see that there was a basis for a Batson challenge or [he] would have done it.” (Remand R. 28.)[6]
“After the government articulates such reasons, the court must evaluate the credibility of the stated justifications based on the evidence placed before it. Id. at 98, 106 S.Ct. at 1724. When the prosecutor, in response to a Batson challenge, states his reasons for striking black jurors, he must stand or fall on the plausibility of the reasons stated. Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 2332, 162 L.Ed.2d 196 (2005). The court must then evaluate the plausibility of the stated reasons ‘in light of all evidence with a bearing on [them]’. Id. at 2331. The defendant maintains at all time, however, the ultimate burden of proving intentional discrimination. Bat-son, 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18.”
United States v. Houston, 456 F.3d 1328, 1335 (11th Cir.2006).
“It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), affd 715 So.2d 819 *455 (Ala.1998). ‘Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ ”
Martin v. State, 62 So.3d 1050, 1059-60 (Ala.Crim.App.2010), cert, denied, Martin v. Alabama, — U.S.-, 132 S.Ct. 126, 181 L.Ed.2d 48 (2011). “‘[Flailing to strike a white juror who shares some traits with a struck [non-white juror] does not itself automatically prove the existence of discrimination.’ United States v. Stewart, 65 F.3d 918, 926 (11th Cir.1995).” United States v. Novaton, 271 F.3d 968,1004 (11th Cir.2001). “If a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination. ...” Miller-El v. Dretke, 545 U.S. at 241, 125 S.Ct. 2317. A valid Bat-son reason for removing a prospective juror does not have to “rise to the level of a challenge for cause.” Ex parte Branch, 526 So.2d at 623.
“Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding ‘largely will turn on evaluation of credibility.’ 476 U.S., at 98, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within a trial judge’s province.’ Wainwright v. Witt, 469 U.S. 412, 428 (1985), citing Patton v. Yount, 467 U.S. 1025,1038 (1984).”
Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
In this case, the prospective jurors completed a 10-page juror questionnaire, and the voir dire examination was extensive — it consisted of approximately 700 pages of the transcript. The State struck eight black prospective jurors — jurors P.C., J.W., M.M., K.J., G.W., B.T., K.S., and O.J. — based on their views or reservation toward capital punishment. The State struck nine white prospective jurors — jurors J.C., M.G., C.L., C.Sh., D.H., B.F., P.G., C.Sm., and D.E. — based on their views toward capital punishment. “ ‘Where whites and blacks are struck for the same reason, there is no evidence of disparate treatment.’ ” Bush v. State, 695 So.2d 70, 100 (Ala.Crim.App.1995), affirmed, 695 So.2d 138 (Ala.), cert, denied, Bush v. Alabama, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting Carrington v. State, 608 So.2d 447, 449 (Ala. Crim.App.1992). “A juror’s opposition to capital punishment is a sufficiently race-neutral reason to strike a juror.” Smith v. State, 797 So.2d 503, 522 (Ala.Crim.App. 2000), cert, denied, 797 So.2d 549 (Ala.), cert, denied, Smith v. Alabama, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001). See also Mashbum v. State, 7 So.3d 453 (Ala.Crim.App.2007), cert, denied, 556 U.S. 1270, 129 S.Ct. 2736, 174 L.Ed.2d 250 (2009); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), affirmed, 820 So.2d 883 (Ala.2001), cert, denied, Johnson v. Alabama, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002); Wood v. State, 715 So.2d 812 (Ala.Crim.App.1996), affirmed, 715 So.2d 819 (Ala.1998), cert, denied, Wood v. Alabama, 525 U.S. 1042,119 S.Ct. 594, 142 L.Ed.2d 536 (1998); Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), affirmed, 627 So.2d 874 (Ala.1993), cert. *456 denied, Carroll v. Alabama, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
“ ‘Although a juror’s reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike.’ Johnson v. State, 620 So.2d 679, 696 (Ala.Cr.App.1992), reversed on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert, denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Dallas v. State, 711 So.2d 1101, 1104 (Ala.Crim.App.1997), affirmed, 711 So.2d 1114 (Ala.), cert, denied, Dallas v. Alabama, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998).
The jurors who had relatives incarcerated at the time of Whatley’s trial were struck by the State. The State struck seven black prospective jurors— jurors C.C. B.D., B.T., S.W., C.H., C.O., and K.J. — who had relatives incarcerated at the time of Whatley’s trial; it struck two white prospective jurors — jurors L.B. and S.C. — for this same reason. “Strikes based on ‘[p]revious criminal charges, prosecutions, or convictions of the venire-member or a family member ...,’ have been found not to violate Batson.” Knight v. State, 652 So.2d 771, 773 (Ala.Crim.App. 1994).
One black prospective juror, M.M., and one white prospective juror, D.B., were struck because they indicated that they would hold the State to a higher burden of proof. “[T]he fact that a venire-member would hold the State to a higher burden of proof is a race-neutral reason for striking that veniremember.” Blanton v. State, 886 So.2d 850, 874 (Ala.Crim.App. 2003), cert, denied, 886 So.2d 886 (Ala.2004), cert, denied, Blanton v. Alabama, 543 U.S. 878, 125 S.Ct. 119, 160 L.Ed.2d 131 (2004).
The State also struck one black prospective juror, C.A., and two white prospective jurors, C.L. and B.F., because they worked for attorneys. “Age, place of employment and demeanor of the potential juror have been held to be sufficiently race-neutral reasons for exercising a peremptory challenge.” Sanders v. State, 623 So.2d 428, 432 (Ala.Crim.App.1993).
Jurors L.W. and A.P. were struck because they knew defense counsel. L.W. stated that the defense attorney had previously represented her ex-boyfriend and A.P. said that defense counsel had previously represented the father of her child. A juror’s knowing defense counsel is a valid race-neutral reason for striking a juror. See McGahee v. State, 554 So.2d 454, 462 (Ala.Crim.App.1989), affirmed, 554 So.2d 473 (Ala.1989).
The State used its last strike to remove juror T.P. based on her responses during voir dire concerning drug use. T.P. indicated that she was not offended by drug use. When questioned further she said that she “believed that those who are continual users and abusers or sell to children are the only ones that should really be punished to the full extent of the law.”[7] The prosecutor stated:
“Based on this line of questioning and her demeanor throughout this questioning, the State believed as though she would need the Defendant to be a continual or habitual offender in order to vote for death or in her words ‘to be punished to the full extent of the law.’ In this case, the State would not be *457 presenting evidence during the trial phase of [Whatley] being a continual user or selling any type of drugs to children. Based on the fact that these two specific examples were given by [T.P.] as reasons to punish someone to the full extent and would not be evidence in this case, the State struck this juror.”
(Remand R. 55.) The State questioned whether T.P. would hold accountable only those individuals who are continual abusers or who sell drugs to small children. This reason was race neutral.
“Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ ” Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994) (quoting Hernandez v. New York, 500 U.S. at 360).
‘“When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App. 2001). ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.’ Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).”
Doster v. State, 72 So.3d 50, 73-74 (Ala. Crim.App.2010).
The circuit court found that the State’s reasons for removing the 17 black prospective jurors were race neutral. The court also specifically noted that the current Mobile County District Attorney’s Office did not have a history of violating Batson and that the cases cited by the defense for this proposition were cases tried under a former administration. Giving due deference to the circuit court’s findings, which we must, we hold that based on the totality of the relevant factors, the circuit court’s findings are not “clearly erroneous.” Accordingly, we find no Batson violation in this case.
We now address the remaining issues that were raised in Whatley’s original brief to this Court.

Guili-Phase Issues

II.
Whatley next argues that the circuit court failed to protect him from prejudicial pretrial publicity, thereby violating his right to trial by a fair and impartial jury. Whatley raises two grounds in support of this contention.
A.
First, Whatley argues that the circuit court erred in denying his motion for a change of venue because of allegedly prejudicial pretrial publicity surrounding the ease. Specifically, he asserts that the publicity was “extremely prejudicial” because it included coverage that Whatley had been convicted of another murder in Texas.
The record shows that in October 2007, Whatley moved for a change of venue because, he asserted, prejudicial publicity had saturated the community. (C.R. 272.) The State filed a brief in opposition to the motion. (C.R. 277.) A hearing was held in June 2008. At the hearing the managing editor of the Mobile Press-Register *458 newspaper testified that he retrieved six articles that had been written about the case. The articles were published on December 31, 2003; January 3, 2004; January 5, 2004; January 7, 2004; January 11, 2004; and September 29, 2006. The only article to mention Whatley by name, he said, was the article published in September 2006. The circuit court indicated that very little publicity had surrounded the case when the trial started in November 2008 and that it would consider the answers given during voir dire examination before making its final ruling on the motion for a change of venue. During voir dire examination, only seven prospective jurors indicated that they had heard or read anything about the case. After several of those jurors were removed for cause based on their views on capital punishment, the remainder of those jurors indicated that the little they remembered about the case would not affect their ability to be impartial. The circuit court issued a written order denying Whatley’s motion for a change of venue. (C.R. 293.)
“A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).
“Rule 10.1(a), Ala. R.Crim. P., provides that a ‘defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and unbiased verdict cannot be had for any reason.’ The burden of proof is on the defendant ‘to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.’ Rule 10.1(b).
“ ‘[A] change of venue must be granted only when it can be shown that the pretrial publicity has so “pervasively saturated” the community as to make the “court proceedings nothing more than a ‘hollow formality,’ ” Hart v. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala. 1992), cert, denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417 [1419], 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact “that a case generates even widespread publicity.” Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert, denied, 502 U.S. 1030,112 S.Ct. 868, 116 L.Ed.2d 774 (1992). “ ‘Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or den-unciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].’ ” Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert, denied, 353 So.2d 35 (Ala.1977). Furthermore, in order for a defendant to show prejudice, the “ ‘proper manner *459 for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.’ Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978).” Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert, denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).’”
Joiner v. State, 651 So.2d 1155, 1156 (Ala. Crim.App.1994), quoting in part, Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
The voir dire examination clearly shows that few jurors had heard or read about the case, and those jurors indicated that they could be impartial. The record supports the circuit court’s ruling denying Whatley’s motion for a change of venue. Accordingly, we find no error. See Joiner.
B.
Whatley next argues, in one sentence in his toief to this Court, that the circuit court erred in refusing to sequester the jurors during his trial.
The record shows that in July 2007 Whatley moved that the jury be sequestered. The circuit court initially granted this motion and stated, in part: “Under the provisions of Section 12-16-9, Code of Alabama (1975), the Court hereby finds that this trial jury must be kept together without separation for the duration of this trial, from the start of each day at approximately 8:30 a.m. until approximately 5:30 p.m. each day.” (C.R. 58.) Whatley moved that the court reconsider its ruling. The circuit court then issued another order setting out its reasons for denying the motion to sequester the jury. The court stated in part:
“When the Court granted the Defendant’s motion, the court anticipated a barrage of pre-trial publicity and trial publicity because of the facts surrounding the victim’s lifestyle ... and the way the defendant and [the] victim met. Contrary to the Court’s assumption, there has been no pre-trial publicity that the Court is aware of in the weeks and months prior to this trial date. There has only been one newspaper article during the voir dire process, which lasted three days. On the first day of voir dire all jurors were given cautionary instructions not to listen or read media reports. Less than 10 jurors had read or heard any media coverage of this crime and that was the coverage which took place almost five years ago when the victim was killed. None of these juror’s knew any specifics of the case and all answered that they could disregard what they may have heard or read.”
(C.R. 68.)
Section 12-16-9, Ala.Code 1975, as amended effective June 15, 1995, states:
“In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate.”
See also Rule 19.3(a), Ala. R.Crim. P.
“Even in a capital case there is no requirement that a court sequester the jurors during the trial. The decision to grant or deny a motion to sequester the jury during trial is within the sound discretion of the trial court.” Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert, denied, Belisle v. Alabama, 557 U.S. 939, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009). See also Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d *460 32 (Ala.Crim.App.2009); Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007), cert, denied, Sneed v. Alabama, 555 U.S. 1155,129 S.Ct. 1039,173 L.Ed.2d 472 (2009); Centobie v. State, 861 So.2d lili (Ala.Crim.App.2001), cert, denied, 861 So.2d 1145 (Ala.2003).
Here, the circuit court gave detailed instructions and admonished the jury not to talk to anyone about the case or to listen or read any media coverage of the case. The record clearly shows that the circuit court took every precaution to ensure that the jurors were not exposed to any outside influences. There is no evidence indicating that the circuit court abused its considerable discretion in denying Whatley’s motion to sequester the jury. Thus, we find no error.
III.
Whatley next argues that the circuit court erred in death-qualifying the prospective jurors because, he says, it resulted in a conviction-prone jury and violated state and federal law.
Whatley moved that the court not allow the prospective jurors to be questioned concerning their views on the death penalty. (C.R. 85.) He asserted that the practice resulted in a conviction-prone jury, denied him a trial by a fair cross section of the community, and resulted in undue prejudice. The circuit court denied the motion.
The United State Supreme Court in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), held that it was not unconstitutional to inquire of veniremembers in a capital-murder trial as to their views on capital punishment. “Alabama courts have consistently held likewise.” Sockwell v. State, 675 So.2d 4, 18 (Ala.Crim.App.1993), affirmed, 675 So.2d 38 (Ala.1995), cert, denied, Sockwell v. Alabama, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). See also Lee v. State, 44 So.3d 1145 (Ala.Crim.App.2009); Sneed v. State, supra; Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert, denied, Brown v. Alabama, 557 U.S. 938,129 S.Ct. 2864,174 L.Ed.2d 582 (2009); Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005), cert, denied, Blackmon v. Alabama, 556 U.S. 1209, 129 S.Ct. 2052, 173 L.Ed.2d 1136 (2009).
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), affd, 603 So.2d 412 (Ala.1992), cert, denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995), affirmed, 718 So.2d 1166 (Ala.1998), cert, denied, Davis v. Alabama, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). The circuit court committed no error in allowing the State to death-qualify the .prospective jurors in order to discover their views on capital punishment.
IV.
Whatley next argues that the circuit court lessened the jurors’ responsibility by commenting during voir dire examination that the case would be reviewed if Whatley was convicted.
*461 The circuit court gave the following instruction to the venire at the end of the first day of the proceedings:
“So don’t go do any independent investigation on your own, don’t look up anything on the computer. Just come down here like you are today ready to be involved in the case. Don’t be nervous about it. Every case is important. We’re just a little more — doing things little bit more by the book when it’s a capital case as opposed to a normal case because we know that, depending on how it turns out, that a lot of extra people look at the case. These questionnaires that you’re getting ready to get, I don’t think they particularly ask you any questions that you would consider intrusive but maybe some of you do and I can understand that_ But these questions, the attorneys on both sides look at the questions and then after the case is over they’re sealed. They’re under a court order and put in an envelope and they’re sealed and never looked at again unless there’s some reason that the case is appealed or is retried, they need to be looked at.”
(R. 167-68.) Counsel objected to the above comments. (R. 171.)
Whatley argues on appeal that these comments violate the United States Supreme Court’s decision in Caldwell v. Mississippi 472 U.S. 320, 105 S.Ct. 2683, 86 L.Ed.2d 231 (1985), by suggesting that “the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.” 472 U.S. at 329.
We do not agree. The circuit court’s comments in no way diminished the jury’s role in fixing Whatley’s sentence, rather the court merely stated what every juror knew — that if Whatley was convicted his case would be reviewed by a higher court. Moreover, the circuit court instructed the jury not to let anything it had said or done influence the jury’s verdict. (R. 1370-71.) Accordingly, we And no error in the above comments made by the circuit court during voir dire.
V.
Whatley next argues that the admission of irrelevant and prejudicial evidence violated state and federal law. Whatley asserts two grounds in support of this argument.
A.
First, Whatley argues that the trial court erred in allowing various items that were seized from the crime scene, such as condom wrappers and cigarette butts, to be admitted into evidence because they had no connection to the murder and were irrelevant.
Whatley specifically challenges the admission of the following exhibits: State’s exhibits 221 and 222, cigarette butts discovered near the victim’s body; State’s exhibit 223, a cigarette butt collected from the ashtray of the victim’s vehicle; State’s exhibit 224, a cigarette butt collected from the floorboard of the victim’s vehicle; State’s exhibits 225, straw that was found under the shoes discovered near the victim’s body; State’s exhibit 226, a condom wrapper found near the victim’s body; State’s exhibit 227, a cigarette butt found five feet from the victim’s body; State’s exhibit 228, a condom wrapper found five feet from the victim’s body; State’s exhibit 229, a plaster casting of a handprint found next to the victim’s body that had a hair in the mold; State’s exhibit 202, tennis shoes that were found near the victim’s body; and State’s exhibits 230 through 236, swabbings taken from various items discovered at the crime scene.
*462 Defense counsel objected, stating that the items were not relevant to his case and that they should be excluded. The prosecutor responded:
“The purpose of these exhibits is to show all the items that were collected by the Mobile Police Department at the scene to try and solve this crime. The defense made references in opening statements about the police department not doing anything and not making efforts to arrest the defendant and connoting bad police work on behalf of the police department.”
(R. 1077.)
Alabama follows a liberal view of relevancy. See Rule 401, Ala. R. Evid. Rule 401 states:
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
(Emphasis added.)
“Under the liberal test of admissibility in Alabama, ‘a fact is admissible if it has any probative value, however slight, upon a matter in the case.’ [C. Gamble, McElroy’s Alabama Evidence, § 21.01 at 34 (4th ed.1991).] ‘Evidence as to the scene of a crime, as to objects found thereat, and as to the condition of the body, is admissible and relevant evidence, when reasonably proximate to the scene in time and location.’ Petty v. State, 40 Ala.App. 151, 154, 110 So.2d 319, 322 (1958), cert, denied, 269 Ala. 48, 110 So.2d 325 (1959). Evidence as to objects found at or near the scene of the crime charged within a reasonable time and proximity after the commission of the crime is ‘always admissible.’ Busbee v. State, 36 Ala.App. 701, 703, 63 So.2d 290, 292 (1953).” Parker v. State, 587 So.2d 1072, 1090 (Ala. Crim.App.1991), affirmed, 610 So.2d 1181 (Ala.1992), cert, denied, Parker v. Alabama, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993).
“In Madley v. State, 192 Ala. 5, 68 So. 864 [ (1915) ], a prosecution for homicide, it is stated, in reference to testimony as to objects found at or near the scene of the crime: ‘Evidence as to the scene of the crime is always admissible on the trial of offenses like the one in question.’ We think that the broad rule therein stated must undoubtedly be limited by requirements of reasonable proximity as to time of findings and location of the objects.”
Busbee v. State, 36 Ala.App. 701, 703, 63 So.2d 290, 292 (1953).
The items that were introduced and admitted were all recovered within several feet of the victim’s body or were discovered in the victim’s stolen vehicle; therefore, they were “reasonably proximate to the scene in time and location” and were properly admitted. See Parker, 587 So.2d at 1090. The circuit court did not err in allowing these items to be received into evidence.
B.
Whatley further argues that it was error to admit into evidence photographs of the victim’s body that were taken at the crime scene because, he says, they were cumulative and highly prejudicial.
During the medical examiner’s testimony, the State introduced State’s exhibits 123 through 126, photographs taken at the crime scene of the victim’s body. Defense counsel objected and stated that the photographs were “duplicative.” The circuit court allowed the four photographs to be admitted into evidence. (R. 1135.)
*463 “The question to be answered in determining the admissibility of a photograph of a victim is ‘whether it has a reasonable tendency to prove or disprove some material fact in issue. This decision is left largely to the sound discretion of the trial judge.’ Charles W. Gamble, McElroy’s Alabama Evidence § 207.01(2) (5th ed.1996). Here, the photographs were relevant because they showed the injuries suffered by the victim and the location of the crime. They also depicted information contained in the appellant’s confession and in several witnesses’ testimony. Photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jury. Ex parte Siebert, [555 So.2d 780 (Ala.1989) ]. Here, the appellant failed to show that the photographs were unduly prejudicial.”
Ray v. State, 809 So.2d 875, 888 (Ala.Crim. App.2001), cert, denied, 809 So.2d 891 (Aa. 2001), cert, denied, Ray v. Alabama, 534 U.S. 1142, 122 S.Ct. 1096, 151 L.Ed.2d 993 (2002).
“The photographs were admissible because they were relevant to show the crime scene and the injuries [the] victim suffered, and because they helped to illustrate the testimony given by the investigating officers concerning the crime scene, as well as to illustrate the testimony of the coroner concerning the type and extent of the wounds that caused the vietim[’s] death.”
Maxwell v. State, 828 So.2d 347, 363 (Ala. Crim.App.2000), cert, denied, Maxwell v. Alabama, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002). “ ‘The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim’s wounds are admissible despite the fact that they are gruesome or cumulative.’ ” Land v. State, 678 So.2d 201, 207 (Ala. Crim.App.1995), affirmed, 678 So.2d 224 (Ala.), cert, denied, Land v. Alabama, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
The circuit court did not abuse its discretion in allowing the photographs of the victim’s body to be received into evidence.
VI.
Whatley next argues that Investigator Steve Thrower was improperly allowed to testify to the ultimate issue in the case when he testified that Whatley “basically admitted that he had committed a capital murder.” (R. 1056.)
Thrower, an investigator with the district attorney’s office in Beaumont, Texas, testified that he spoke with Whatley in Texas in August 2006. The following occurred:
“[Prosecutor]: What did he tell you? You’re looking at your statement, Mr. Thrower — Ater he gave you his name and his age and some preliminary information, what did he say here? “[Investigator Thrower]: He said he had given his life to Christ and he wanted to clear up a murder that he had committed in Aabama back in 2003. “[Prosecutor]: Okay. And did he give you details regarding the murder that he had committed in Mobile, Aabama? “[Investigator Thrower]: Yes, ma’am, but it was an offense I was not familiar with. I just had to go with what he was telling me. He detailed a crime here in Aabama and I just wrote it up as he basically told it.
“[Prosecutor]: And did he indicate what type of crime that he believed — or that he had committed? Did he indicate what type of — what he believed to be [the] crime that he had committed? “[Investigator Thrower]: Yeah, he basically admitted that he had committed a *464 capital murder here in Alabama. He had killed a man during the course of a robbery.”
(R. 1055-56; emphasis added.) Whatley did not object to Thrower’s testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“An ultimate issue has been defined as the last question that must be determined by the jury. See Black’s Law Dictionary [1522 (6th ed.1990) ].” Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997). Investigator Thrower did not testify concerning the ultimate issue but merely related a version of what Whatley told him. Thrower’s testimony was cumulative of Whatley’s confession that was introduced into evidence. Whatley told Thrower that he went to a local bar in Mobile, Alabama, intending to rob someone, that he killed Patel, and that he took Patel’s vehicle and wallet. The admission of cumulative evidence constitutes harmless error. See Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), affirmed, 675 So.2d 905 (Ala.1996). “The harmless error rule applies in capital cases.” Musgrove v. State, 519 So.2d 565, 575 (Ala.Crim.App.1986), affirmed, 519 So.2d 586 (Ala.1986), cert. denied, Musgrove v. Alabama, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). Accordingly, we find no plain error in the admission of Thrower’s cumulative testimony.
VII.
Whatley argues that it was error to allow Faron Brewer of the Alabama Department of Forensic Sciences to testify that he entered a DNA profile from a sample taken from a cigarette butt recovered near the victim’s body into the Federal Bureau of Investigation’s combined DNA index system (“CODIS”) and that the database returned a match with What-ley’s DNA. Whatley asserts that the fact that his DNA was in CODIS “strongly suggested” to the jury that he had a prior conviction and was inadmissible.
Brewer, a DNA specialist, testified that he conducted DNA tests on the items that were collected from the crime scene. He said:
“The DNA data base is called the CO-DIS. That stands for combined DNA index system. It’s a database that’s run by the FBI and it contains DNA profiles from forensic unknowns which are DNA profiles from crime scenes or associated with crimes that are unsolved. It contains DNA profiles from victims and suspects in crimes and also missing persons, relatives of missing persons and convicted offenders.”
(R. 1214.)[8] The result obtained from one of the cigarettes matched Whatley’s DNA, but the results from the other items were inconclusive. Whatley did not object to this testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Alabama has not had occasion specifically to consider whether the mere testimony that a defendant’s DNA was matched to evidence using CODIS implies that the defendant has a prior conviction and is therefore inadmissible.[9] However, we have held: “The mere existence of recorded fingerprints does not per se imply the *465 existence of a criminal record.” Brown v. State, 369 So.2d 881, 884 (Ala.Crim.App. 1979).
The Missouri Court of Appeals, in affirming a ruling on the admission of evidence that the defendant’s DNA was matched using a statewide database, stated:
“Prior to trial, McMilian filed a motion in limine requesting that the State be barred from making any reference to the statewide DNA database, otherwise known as the ‘CODIS system,’ because, ‘[i]f the State refers to a “cold hit” through the CODIS system, the jury will infer that [McMilian] has one or more prior convictions.’ The trial court denied the motion on the basis that ‘there has to be some explanation how this [DNA] match occurred,’ and that ‘the general public is [not] aware of the DNA requirements for convictions or for convicts.’ The court did, however, preclude the State from making any direct reference to the fact that McMilian’s DNA was in the statewide system as the result of his prior criminal convictions. The court also required the State to elicit testimony that the statewide system contained DNA from individuals other than just convicted felons.
[[Image here]]
“DNA profiles are difficult to distinguish from fingerprint cards in this context. In both cases, the State has compiled databases containing identifying information. In both cases, identifying evidence from an unknown perpetrator can be compared to the database, enabling police to find a lead where none previously existed. In cases where a ‘hit’ or match is made, the State needs to be able to explain how a particular individual became a suspect, especially where, as here, a considerable period of time has passed since the offense. In both cases, a possibility exists that the public may assume that this identifying information is collected primarily or exclusively from persons arrested for, and/or convicted of, crimes.
“... [T]he mere fact that McMilian’s DNA profile was present in a statewide database did not constitute an improper reference to other, uncharged crimes.”
Missouri v. McMilian, 295 S.W.3d 537, 540 (Mo.Ct.App.2009). See also People v. Harland, 251 P.3d 515, 518 (Colo.Ct.App. 2010) (“We therefore reject defendant’s assertion that [police officer’s] testimony mentioning the DNA databases necessarily led the jury to speculate that defendant had prior criminal convictions. Under the circumstances here, any inference of such prejudice is itself speculative.”); People v. Jackson, 232 I11.2d 246, 272, 903 N.E.2d 388, 402, 328 IlLDec. 1, 15 (2009) (“[W]e are unwilling to assume, as defendant does, that the jury had any preconceived notions of the types of persons from whom DNA had been collected and stored for [law enforcement] to reference through the ‘eodus [sic] ... [or] data base administrator’ in Springfield.”); Atteberry v. State, 911 N.E.2d 601, 609 (Ind.Ct.App.2009) (“Atteberry argues ... the jury could have inferred that, because Atteberry’s DNA profile was in the database, he had been convicted in the past. This is nothing more than speculation. Moreover, evidence which creates a mere inference of prior bad conduct does not fall within the purview of Evidence Rule 404(b).”); Deals v. Berghuis, (No. l:08-cv-1000, June 16, 2011) (W.D.Mich.2011) (unpublished order) (“The only unfairly prejudicial effect of the DNA evidence asserted by petitioner is that these witnesses mentioned that the DNA found at the scene was matched with petitioner’s using the CODIS database. Petitioner asserts that this ‘as good as tells the jury that [petitioner] has a prior rec *466 ord.... ’ The Court of Appeals correctly noted that this argument is based on speculation and assumption concerning inferences that the jury might have made.”); People v. Meekins, 34 A.D.3d 843, 828 N.Y.S.2d 83 (2006) (affirming admission of evidence concerning match on DNA database).
We agree with the states that have considered this issue, and we hold that testimony of the mere existence of a defendant’s DNA profile in the CODIS database does not “per se” imply the existence of a criminal history. Here, Brewer indicated that there were several reasons why a person’s DNA would be in CODIS. Accordingly, we find no plain error in the admittance of Brewer’s testimony.
VIII.
Whatley next argues that the court erred in allowing the medical examiner to testify concerning the position of the victim’s body when certain wounds were inflicted. Citing Crawford, v. State, 262 Ala. 191, 78 So.2d 291 (1954), and Smith v. State, 466 So.2d 1026 (Ala.Crim.App.1985), Whatley argues that it was reversible error to allow the medical examiner to testify concerning the position of the victim’s body when the blows to his head were inflicted.
The record shows that during Dr. Kathleen Enstice’s testimony, the following occurred:
“[Prosecutor]: Could you tell based on the evidence that you saw at the scene and the evidence on the clothing and at the autopsy, when the blunt force blows to the head were inflicted, could you tell what position the victim was in when those blunt force blows to the head occurred?
“[Defense counsel]: Your Honor, if it please the Court I would object to that conclusion. That would be a matter that would invade the province of the jury and the jury would be the one that determines what the positioning was.
“[Prosecutor]: And, Your Honor, she’s basing that on her observations and her training and experience as a forensic pathologist regarding the evidence that she observed on the victim. “[The Court]: I’m going to charge y’all on this. I’m going to allow you to answer. I’m going to charge this. She’s an expert witness and I’ll tell you in the charge what an expert witness is but basically the charge says, you’re to listen to the expert’s testimony but you do not have to fully accept all or part of the expert’s testimony. You are the final judge of everything especially the expert witness’s testimony. This is her opinion. You all are the final judges. Go ahead.
“[Prosecutor]: And the question again was, based on your training and experience and to a reasonable degree of medical certainty and your observations of the victim both at the scene and during autopsy, do you have an opinion as to the position that the victim was in at the time that the blows were inflicted to his face?
“[Defense counsel]: Your Honor, I would make my same objection.
“[Dr. Enstice]: Looking at Mr. Patel at the scene the upper part of the shirt he was wearing had blood spatter that was headed downward. At one point he— the upper part of his body would be upright for that to have happened. However, looking at Mr. Patel lying in the supine position, blood also — and I think we saw a photograph of it, was going across the sides of his face most likely from injury indicating his face was — he was in a supine position in a *467 flat — lying in a flat position because the blood went this way.”
(R. 1174-75.)
In Crawford, the Alabama Supreme Court held that “it is not competent for a witness, expert or non-expert, to draw conclusions for the jury, from examination of the body of deceased and wounds thereon, as to the relative positions of the parties when the fatal shot was fired.” 262 Ala. at 192, 78 So.2d at 292.
In 1989, the Alabama Supreme Court revisited this issue and held that the admission of testimony concerning the positions of the parties at the time injuries were inflicted constituted reversible error only when the position of the bodies was an issue at trial. The Court stated:
“On cross-examination, Dr. Embry testified in more detail about the relative positions of the parties. The prosecutor and Dr. Embry even demonstrated the relative positions of the parties during the questioning. Petitioner argues that this testimony and demonstration invaded the province of the jury and were injurious to his substantial rights, citing Smith v. State, 466 So.2d 1026 (Ala. Crim.App.1985); Wilson v. State, 430 So.2d 891 (Ala.Crim.App.1988); and Ivey v. State, 369 So.2d 1276 (Ala.Crim. App.1979), cert, denied, 369 So.2d 1281 (Ala.1979). Each of the cases cited by the petitioner involved a homicide by shooting, and in each case the defendant claimed accident or self-defense; the prejudicial error in each case occurred because the relative positions of the parties constituted a material inquiry of critical importance. In this case, the petitioner’s defense at trial was an alibi: that he was not at the scene of the crime and that someone else must have robbed, sodomized, and murdered the victim. The testimony concerning the position of the assailant when he stabbed the victim in the back 17 times was not of critical importance to any issue at trial. We find a compelling distinction between the facts of those cases cited by petitioner and the facts and issues of this case; therefore, we hold that the trial court did not commit error injurious to the petitioner’s substantial rights by allowing Dr. Embry to testify as to the relative positions of the parties.”
Ex parte Davis, 554 So.2d 1111, 1115 (Ala. 1989), cert, denied, Davis v. Alabama, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991).
In Lane v. State, 673 So.2d 825 (Ala. Crim.App.1995), we explained:
“ ‘In a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. “This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound.” Mathis v. State, 15 Ala.App. 245, 248, 73 So. 122, 124 (1916).
“ ‘However, a properly qualified expert may testify to the “path of flight” or trajectory of the bullet, Wilbanks v. State, 42 Ala.App. 39, 151 So.2d 741, cert, denied, 275 Ala. 701, 151 So.2d 744 (1963). He may testify to the slant or angle of the gunshot wound and describe its character. Woods v. State, 54 Ala.App. 591, 310 So.2d 891 (1975); Mathis v. State, supra. An *468 expert may testify about the direction from which the bullet was fired or the blow was struck, Blackmon v. State, 246 Ala. 675, 680, 22 So.2d 29 (1945), Richardson v. State, 37 Ala.App. 194, 65 So.2d 715 (1953), and may state the distance between the deceased and the barrel of the weapon at the time the fatal shot was fired. Straughn v. State, 270 Ala. 229, 121 So.2d 883 (I960).’
“Ivey v. State, 369 So.2d at 1276, 1280, (Ala.Cr.App.1979), writ denied, 369 So.2d 1281 (1979) (on rehearing). See also Raspberry v. State, 615 So.2d 657 (Ala.Crim.App.1992). In this case, the coroner did not testify concerning the relative position of the parties at the time of the murder. He only discussed the angle of the victim’s wounds, testimony which is permissible. Ivey; Raspberry.”
673 So.2d at 828-29. See also Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007), cert, denied, Saunders v. Alabama, 556 U.S. 1258, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009); Robitaille v. State, 971 So.2d 43 (Ala.Crim.App.2005), cert, denied, Robitaille v. Alabama, 552 U.S. 990, 128 S.Ct. 490,169 L.Ed.2d 339 (2007).
In this case, the coroner did not testify about the position of the victim in relation to that of his assailant but testified as to the position of the victim at the time he suffered the blows to his head. Moreover, the relative positions of the parties was not at issue in the case. For the above reasons, there was no reversible error in allowing the medical examiner’s testimony about the position of the victim’s body when the blows to his head were inflicted. See Lane.
IX.
Whatley next argues that the jury instructions in the guilt phase were erroneous. He cites several grounds in support of this assertion.
When reviewing a trial court’s jury instructions, we keep in mind the following:
“ ‘ “A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), affd in relevant part, 659 So.2d 122 (Ala.1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State.” ’
“Griffin v. State, 790 So.2d 267, 332 (Ala.Crim.App.1999), quoting Ingram v. State, 779 So.2d 1225, 1258 (Ala.Crim.App.1999). ‘This court has consistently held that a trial court’s oral charge to the jury must be viewed in its entirety and not in “bits and pieces.” Parks v. State, 565 So.2d 1265 (Ala.Cr.App.1990); Williams v. State, 538 So.2d 1250 (Ala. Cr.App.1988); Lambeth v. State, 380 So.2d 923 (Ala.), on remand, 380 So.2d 925 (Ala.Cr.App.1979), writ denied, 380 So.2d 926 (Ala.1980).’ Smith v. State, 585 So.2d 223, 225 (Ala.Crim.App.1991).”
Smith v. State, 908 So.2d 273, 295 (Ala. Crim.App.2000), cert, quashed, 908 So.2d 302 (Ala.2005), cert, denied, Smith v. Alabama, 546 U.S. 928, 126 S.Ct. 148, 163 L.Ed.2d 277 (2005).
“ ‘A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case.’ Ingram v. State, 779 So.2d 1225 (Ala.Crim. *469 App.1999) (citing Roper v. State, 584 So.2d 544 (Ala.Crim.App.1991)). Moreover, this Court does not review jury instructions in isolation, instead we consider the instruction as a whole. Stewart v. State, 601 So.2d 491 (Ala.Crim. App.1992).”
Living v. State, 796 So.2d 1121, 1180-31 (Ala.Crim.App.2000). “The trial court may refuse an instruction on a lesser included offense if it is clear to the judicial mind that there is no rational basis to support the instruction.” Ex parte Jackson, 674 So.2d 1365,1367 (Ala.1994).
A.
Whatley first argues that the circuit court erred in failing to give instructions on the lesser-ineluded offense of felony murder. Specifically, Whatley asserts that this case is indistinguishable from the Supreme Court’s decision in Ex parte Jackson, 674 So.2d 1365 (Ala.1994), and because there was no instruction on felony murder, he argues, he is entitled to a new trial.
The record shows that Whatley requested a jury instruction on the lesser-ineluded offense of felony murder. The prosecutor argued that based on the large number of injuries inflicted on the victim, a felony-murder instruction was not supported by the evidence. The circuit court agreed and refused to instruct the jury on felony murder. (R. 1286.) Here, the circuit court instructed the jury on the offense of capital murder and the lesser-ineluded offenses of murder, manslaughter/robbery, and manslaughter-heat of passion/robbery.
The Alabama Supreme Court in Jackson was not presented with the issue whether the circuit court erred in failing to instruct the jury on the lesser offense of felony murder. The Supreme Court merely commented in its opinion that a felony-murder instruction was appropriately given in that case based on the facts of the crime. The victim and the defendant in Jackson were seen together at a bar on the evening of the murder. Firemen discovered the charred body of the victim in his house. Shortly thereafter, Jackson was stopped by police driving the victim’s car and was arrested for driving under the influence. The facts in this case are clearly distinguishable from those in Jackson.
“A felony murder is committed when a person commits or attempts to commit one of several enumerated felonies, and, in the course of or in furtherance of the crime or in flight from the crime, that person causes another person’s death. There is an intended felony and an unintended homicide. Ex parte Bates, 461 So.2d 5 (Ala.1984); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993); C. Torcia, Wharton’s Criminal Law, § 147 (15th ed.1994).”
Knotts v. State, 686 So.2d 431, 457 (Ala.Crim.App.1995). “The crime of felony murder is reserved for those situations where an unintended death occurs as a result of a defendant’s dangerous conduct.” Calhoun v. State, 932 So.2d 923, 969 (Ala. Crim.App.2005), cert, denied, Calhoun v. Alabama, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006).
“Even in a capital case a defendant is not entitled to instructions on a lesser included offense unless there is a rational theory from the evidence presented supporting such an instruction. Roberts v. State, 735 So.2d 1244 (Ala.Cr.App. 1997). As we stated in Jenkins v. State, 627 So.2d 1034, 1049-50 (Ala.Cr.App. 1992), affd, 627 So.2d 1054 (Ala.1993), cert, denied, 511 U.S. 1012, 114 S.Ct. 1388,128 L.Ed.2d 63 (1994):
“‘The appellant next argues that the trial court erred in not instructing *470 the jury on the lesser included offense of felony-murder. “An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position.” McMillian [v. State ], 594 So.2d [1253] at 1267 [(Ala.Cr.App. 1991) ]. (Emphasis added.) As Judge Bowen stated in White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App. 1990), affd, 587 So.2d 1236 (Ala.1991), cert, denied, 502 U.S. 1076, 112 S.Ct. 979,117 L.Ed.2d 142 (1992):
“ ‘ “ ‘The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.’ W. LaFave and A. Scott, 2 Substantive Criminal Law § 7.5 at 210 (1986).”
“ ‘(citations omitted). There was no evidence to support an instruction on felony-murder. In the instant case the evidence revealed that the victim died as a result of manual strangulation. “There is no rational basis for a verdict convicting him of felony-murder.” White, 587 So.2d at 1231; § 13A-l-9(b), Code of Alabama 1975.’ “Also, we stated in Dobyne v. State, 672 So.2d 1319, 1345 (Ala.Cr.App.1994), on remand, 672 So.2d 1353 (Ala.Cr.App. 1994), affd, 672 So.2d 1354 (Ala.1995), cert, denied, 517 U.S. 1169, 116 S.Ct. 1571,134 L.Ed.2d 670 (1996):
“ ‘Lesser included offense instructions should be given when there is a “reasonable theory from the evidence” supporting such an instruction. Jenkins [v. State, 627 So.2d 1034 (Ala.Cr. App.1992), affd, 627 So.2d 1054 (Ala. 1993) ]. Here, there was no reasonable theory to support a charge on felony-murder. “ ‘The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.’ ” White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App.1990), affd, 587 So.2d 1236 (Ala.1991), cert, denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Here, the evidence did not show that the shootings were unintended. The court did not err in not instructing the jury on the lesser included offense of felony-murder.’ ”
Hall v. State, 820 So.2d 113, 138-39 (Ala.Crim.App.1999), affirmed, 820 So.2d 152 (Ala.2001), cert, denied, Hall v. Alabama, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002). See also Dobyne v. State, 672 So.2d 1319, 1345 (Ala.Crim.App.1994).
In McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999), affirmed, 781 So.2d 330 (Ala.2000), cert, denied, McWhorter v. Alabama, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001), the defendant argued that the trial court erred in failing to give a jury instruction on the lesser-included offense of felony murder because, McWhorter argued, based on his intoxication, the jury could have concluded that he intended to rob the victim but that he did not intend to kill him. In affirming the trial court’s failure to instruct on felony murder, we stated:
“[I]n Ex parte Clark, 728 So.2d 1126 (Ala.1998), the appellant claimed that the trial court erred in failing to instruct the jury as to the lesser included offense of felony murder because, he said, the jury could have determined that he had committed a first-degree robbery but that he did not intend to murder the victim. However, the Alabama Supreme Court concluded that, based on the evidence presented, ‘a conviction of felony murder would have been inconsistent with the evidence presented at trial because “[t]he [victim’s death was] not *471 ‘unintended [death] caused by [the defendant’s] dangerous conduct.’ ” Taylor v. State, 666 So.2d 36, 55 (Ala.Cr.App. 1994) (citations omitted).’ Id., 728 So.2d at 1135. The Court also found that such a charge would have been inconsistent with the defense presented by the defendant in that he had admitted to the murder, but had claimed that he did not rob the victim.”
781 So.2d at 270-71.
In this case, the victim suffered numerous blunt-force injuries, was strangled, and was run over by a vehicle. “There was absolutely no evidence presented that would bring the murder into the definition of felony murder. The manner of the killing showed that the killing was not an ‘unintended’ murder that would fall under the definition of felony murder.” Hall v. State, 820 So.2d at 139. Also, Whatley’s defense was that he was under the influence of alcohol when the murder was committed. The circuit court did not err in refusing to give a jury instruction on felony murder. See McWhorter and Hall.
B.
Whatley next argues that the circuit court erred in failing to charge the jury that a robbery, sufficient to elevate a murder to a capital offense, must not be a “mere afterthought.” (Whatley’s brief, at 12.)
The circuit court instructed the jury: “During means in the course of the commission of or in connection with the immediate flight from the commission of, in this case, the robbery.” (R. 1350.) The circuit court did not use the term “mere afterthought” in its instruction, and Whatley did not object to the circuit court’s instructions on “during the course of.” Thus, we review this claim for plain error. See Rule 45A, Ala. RApp. P.
“Although this court has held that the taking of property as a mere afterthought to a murder will not support a capital murder conviction under § 13A-5^40(a)(l), Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert, denied, 382 So.2d 1175 (Ala.1980), we have not held that the trial court must use the term ‘mere afterthought’ in the jury instructions on robbery-murder. The trial court more than adequately instructed the jury that the robbery had to occur ‘during’ the course of the murder.”
Woods v. State, 789 So.2d 896, 932-33 (Ala.Crim.App.1999), affirmed, 789 So.2d 941 (Ala.2001), cert, denied, Woods v. Alabama, 534 U.S. 831, 122 S.Ct. 77, 151 L.Ed.2d 41 (2001).
The Alabama Supreme Court in Ex parte Brown, 74 So.3d 1039 (Ala.2011), reaffirmed our holding in Woods, stating:
“Although the trial court did not state specifically that for the jury to find Brown guilty of capital murder-robbery the taking of the property could not be a mere afterthought of the murder, the trial court’s instruction adequately communicated the law by instructing the jury that the robbery had to occur ‘during’ the course of the murder and that the intent to murder and the intent to rob had to coexist. Plain error did not occur in this regard. See Ex parte Windsor, 683 So.2d 1042, 1058-60 (Ala. 1996); Reeves v. State, 807 So.2d 18, 42-44 (Ala.Crim.App.2000); and Woods v. State, 789 So.2d 896, 932-33 (Ala.Crim. App.1999) (recognizing that although the taking of property as a mere afterthought will not support a capital-murder conviction based on an underlying robbery, the trial court does not have to use the term ‘mere afterthought’ in its jury instructions on the robbery element of the capital murder).”
74 So.3d at 1054.
The circuit court’s failure to use the term “mere afterthought” when defining *472 “during the course of’ in relation to the robbery element of this capital offense did not constitute plain error. See Brown.
C.
Whatley argues that the circuit court erred in failing to instruct the jury that Whatley could be convicted of both robbery and intentional murder. Whatley did not object to the court’s failure to charge the jury that he could be convicted of two offenses—intentional murder and robbery—instead of murder made capital because it was committed during a robbery. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
As this Court stated in Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), cert, denied, 868 So.2d 1189 (Ala.), cert, denied, Stallworth v. Alabama, 540 U.S. 1057, 124 S.Ct. 828, 157 L.Ed.2d 711 (2008):
“There was no evidence presented that the robberies and the murders were separate and distinct crimes. ‘The appellant was also not entitled to have the jury charged on the lesser included offense of robbery [or theft]. Because there was a killing in the course of and in furtherance of a robbery, “[i]t is clear ... that the appellant is at least guilty of felony murder.” Kinder v. State, 515 So.2d 55, 72 (Ala.Cr.App.1986).’ Tucker v. State, 650 So.2d 534, 536 (Ala.Crim. App.1994). Furthermore, no felony-murder charge should have been given because the evidence showed that each victim was stabbed multiple times. This was not a situation where an unintended death occurred during the course of a robbery.”
868 So.2d at 1165.
The same is true in this case; there was no evidence indicating that the murder and the robbery were “separate and distinct crimes.” Accordingly, there was no plain error in the court’s failure to charge the jury on murder and robbery as separate and distinct crimes.
D.
Whatley argues that the court erred in instructing the jury on flight. Specifically, Whatley argues that there was no evidence indicating that he fled Alabama to avoid prosecution. He cites the Alabama Supreme Court’s case of Ex parte Weaver, 678 So.2d 284 (Ala.1996), to support his argument that the circuit court’s flight instruction resulted in reversible error.
The record shows that the State moved the circuit court to instruct the jury on flight to avoid prosecution. (C.R. 271.) At the charge conference, the court stated: “I was thinking his flight to Texas but you’re talking about leaving the Cochran Bridge flight obviously. Any comment on [State’s requested instruction number] eight on the flight.” (R. 1262.) Defense counsel then stated: “I think that’s standard.” (R. 1262.) The parties then had a discussion about Whatley’s leaving Alabama for Texas. (R. 1262-64.) Whatley did not object but conceded that the instruction on flight was standard. Thus, if error occurred, it was invited by Whatley. Invited error applies in capital cases and operates to waive the error unless it rises the level of plain error. See Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App. 1996), affirmed, 710 So.2d 1350 (Ala.1997), cert, denied, Williams v. Alabama, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
In Weaver, the Alabama Supreme Court held that the following instruction given by the circuit court was reversible error: “A defendant’s flight to avoid prosecution may be considered by you as tending to show *473 his consciousness of guilt.” The Court stated:
“The evidence indicated that Mr. Estes was killed on or about December 2, 1989; that Weaver moved to Florida in August or September 1990 to live with his niece and to find work; that he did not leave Alabama until after he had been discharged from parole in connection with another offense; and that he was arrested in Florida in June 1991, approximately two months after he had been notified by an investigator with the Attalla, Alabama, Police Department that he was a suspect in the case. The record and the arguments of the parties also suggest that the Attalla Police Department did not begin until February 28, 1991, to focus on Weaver as a possible suspect in the murder of Mr. Estes. Assuming that Weaver was not a suspect when he left Alabama in 1990, we would conclude that the evidence was insufficient to furnish reasonable support for an inference that Weaver’s move to Florida was motivated by a guilty conscience in regard to the murder of Mr. Estes. Our conclusion in this regard would be dictated by the fact that the only reasonable inference to be drawn from the evidence would be that Weaver, approximately eight or nine months after the crime had occurred and at a time when he was under no suspicion of being involved in it, left Alabama and went to Florida to live with a relative and to find work. The length of time between the murder and Weaver’s move to Florida, in conjunction with the fact that Weaver was under no suspicion of being involved in the murder, would weigh heavily against inferring that his move was motivated by a desire to avoid arrest and prosecution for the murder of Mr. Estes. It is also significant, we think, that Weaver delayed his move to Florida until after he had been discharged from parole and that he made no attempt to flee from his niece’s residence in Florida after he had been notified that he was a suspect in the case. As a whole, the record does not appear to demonstrate the kind of instinctive or impulsive behavior on Weaver’s part that generally indicates fear of apprehension and that gives evidence of flight such limited reliability and trustworthiness as it possesses. Although we recognize that prosecutors are generally given wide latitude in proving that an accused fled out of a consciousness of guilt, it is clear that flight evidence can be so untrustworthy, when there is no evidence that the defendant fled because of a consciousness of guilt or a desire to avoid arrest and prosecution, that the probative value of the evidence is outweighed by the prejudice it produces.”
678 So.2d at 291.
In this case, the circuit court gave the following instruction on flight:
“Now with reference to evidence that was presented in this case bearing on the alleged flight by the defendant from the scene of the alleged crime, you, the jury, [are] instructed that evidence may be offered by — hold on. Let me back up. With reference to evidence that was presented in the case bearing on the alleged flight by the defendant from the scene of the alleged crime the jury is instructed that evidence — that this evidence may be offered by the State, it may be considered by you the jury in connection with all of the other evidence in the ease of the circumstances tending to prove guilt. And in connection with such evidence consideration should be given to any evidence of the motive which may have prompted such flight, that is, whether a consciousness of guilt or impending or likely apprehension of *474 being brought to justice caused the flight or whether it was caused by some other more — some other more harmless motive. In the first place where evidence is offered tending to show the defendant’s offense, it would be for you the jury to say whether it is flight as a matter of fact. The jury would have to determine from the evidence the question about whether there was flight or not and then you further would — then you would further consider such evidence in light of all the other evidence in the case including any evidence to negate or explain any such evidence of flight and whether such evidence was a reasonable explanation or not, all of which you would consider in connection with all of the other evidence in the case giving each part of the evidence such weight as you the jury feel — you the jury justly feel it is entitled to receive in this particular case.”
(R. 1365-66.)
The record shows that Patel died in December 2003. On June 6, 2005, police officers interviewed Whatley and informed him that his DNA was discovered on a cigarette butt found near the victim’s body. At that time Whatley denied any involvement in the offense. On June 17, 2005, police collected a DNA sample from Whatley to confirm the match. When the match was verified, police issued a “be-on-the-lookout” for Whatley. Police did not locate Whatley until Texas law-enforcement officials informed them of his location in August 2006.
The facts of this case are distinguishable from those in Weaver. Whatley knew that he was a suspect when he left the State, unlike the defendant in Weaver. Also, the Supreme Court found that the instruction in Weaver was erroneous because it was misleading. Moreover, the instruction in this case, unlike Weaver, gave the jury the option of determining whether there was evidence of flight.
As Professor Gamble writes:
“In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution. This principle is based upon the theory that such is admissible as tending to show the accused’s consciousness of guilt. Evidence of flight is admissible whether it occurred before or after the time of the accused’s arrest.
“The prosecution is generally given wide latitude in proving things that occurred during the accused’s flight. Indeed, the term ‘flight’ includes any conduct of the accused that is relevant to show a consciousness of guilt. Such conduct may include the use of aliases, concealment of identity, attempting to avoid arrest, the use of false exculpatory statements, and the commission of collateral crimes.”
C. Gamble, McElroy’s Alabama Evidence, § 190.01(1) (6th ed.2009).
“Logic would dictate that at some point the flight of the accused will be so far removed from the time of the charged crime that such flight will be too remote to be relevant as having probative value upon the accused’s consciousness of guilt. Remoteness, of course, is vested largely within the discretion of the trial court which will only be reversed for abuse. The cases decided to date have all held that the flight was not too remote from the time of the charged crime to be admissible.”
McElroy’s Alabama Evidence, § 190.01(4). “The remoteness of the flight ... did not affect the admissibility of the evidence, but was relevant only to the weight of the evidence. 29 Am.Jur.2d, Evidence, § 532, p. 608; see also 29 Am.Jur.2d, Evidence, § 537, p. 611.” People v. Compeau, 244 Mich.,App. 595, 598, 625 N.W.2d 120, 123 *475 (2001). See also State v. Moyers, 266 S.W.3d 272, 284 (Mo.Ct.App.2008) (‘“Remoteness of flight in space and time from the scene and time of the alleged crime goes only to the weight of the evidence and not to its admissibility.’ ”); State v. Nixon, 166 N.C.App. 761, 604 S.E.2d 367 (2004) (table) (unpublished disposition) (“Remoteness in time between a crime and a defendant’s flight goes to the weight of the evidence and not its admissibility.”); State v. Bible, 175 Ariz. 549, 592, 858 P.2d 1152, 1195 (1993) (“Within reason, the fact that flight or concealment is remote in time from the crime goes to the weight, not the admissibility, of the evidence.”); Lang-home v. Commonwealth, 13 Va.App. 97, 103, 409 S.E.2d 476, 480 (1991) (“The remoteness in time of the flight goes to the weight of the evidence and not its admissibility.”); Gregory v. State, 540 N.E.2d 585, 592 (Ind.1989) (“The remoteness in time ... go to the weight of the evidence, not its admissibility.”).
“[T]he court’s instruction on flight did not inform the jury Belisle’s move was to avoid prosecution. Instead, the court properly instructed the jury that it was for them to determine if the State had, in fact, presented any evidence of flight. The circuit court’s instructions on flight were correctly given and were accurate. See Rogers v. State, 630 So.2d 88 (Ala. 1992).”
Belisle v. State, 11 So.3d 256, 310 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert, denied, Belisle v. Alabama, 557 U.S. 939, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009).
The circuit court did not err in charging the jury on flight to avoid prosecution.
E.
Whatley next argues that the circuit court’s instructions on intent were erroneous. Specifically, he argues that it was error to charge the jury that intent may be formed “in an instance.” (What-ley’s brief, at 58.) Whatley did not object to the court’s instructions on intent; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The circuit court charged the jury as follows:
“To convict, the State of Alabama must prove beyond a reasonable doubt each of the following elements of intentional murder during — committed during robbery in the first degree: That Pete Patel is dead. That the Defendant Donald Dwayne Whatley caused the death of Pete Patel by strangling him and/or running over him with an automobile. That in committing the act or acts which caused the death of Pete Patel the Defendant intended to kill Mr. Patel or another person. Now a person acts intentionally when it is his purpose to cause the death of that person. The intent to kill must be real and specific.
[[Image here]]
“... A person acts intentionally when it is his purpose to cause the death of another.
“Intent may be formed in an instant. It need not be preplanned or premeditated and there’s no requirement that the intent to kill be formed well in advance of committing the crime. The requisite intent may be formed immediately before a crime is committed.”
(R. 1348-53.) “We have upheld a court’s jury instructions in a capital case when the court instructed the jury that intent may be formed in the ‘spur of the moment.’ See Sneed v. State, 1 So.3d 104 (Ala.Crim. App.2007).” Gobble v. State, 104 So.3d 920, 975 (Ala.Crim.App.2010). The circuit court’s instructions on intent did not constitute plain error.
*476 F.
Next, Whatley argues that the circuit court’s instructions on confessions were erroneous. Specifically, he argues that the instruction violated Ex parte Singleton, 465 So.2d 443 (Ala.1985), and Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988), by informing the jury that more weight should be assigned to a confession than to other evidence. Whatley did not object to the court’s instruction on confession; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The court gave the following instruction:
“Now the State of Alabama has offered into evidence what it contends to be a confession made by the Defendant. You are the sole judges as to whether a confession was indeed made by the Defendant and as to what weight you will give the alleged confession. In this regard all confessions are presumed to be involuntary and in order for you to consider any confession the State must prove to you beyond a reasonable doubt that the purported confession was a voluntary statement given by the Defendant without fear of punishment or hope of reward. I will tell you that confessions when deliberately and voluntarily made are among the most effectual and satisfactory proofs of guilt that can [be] received in the courts of justice. The value of confessions rest on the presumption that human beings will not make statements against their interest unless prompted to do so by truth and their conscience and their value depends upon the fact that they must be deliberately and voluntarily made as I have previously mentioned. You must consider a purported confession in light of all of the surrounding circumstances and all of the evidence in the case. You are not required to accept every part of the purported confession although you should do so if you find reason to believe every part. You should accept such parts of a confession which you believe to be true and reject any such part you believe to be false. You should reject it in its entirety if you find it wholly to be untrue.”
(R. 1364-65.)
In both Singleton and Bush, the cases cited by Whatley, the instructions were found to be erroneous because they informed the jury that the circuit court had made a preliminary finding on the voluntariness of the defendant’s confession. The instructions in this case do not contain the statements that were found to be offensive in Singleton and Bush. Here, “the trial court did not take away the jury’s function in determining voluntariness.” Gaddy v. State, 698 So.2d 1100, 1120 (Ala.Crim.App.1995), affirmed, 698 So.2d 1150 (Ala.1997), cert. denied, Gaddy v. Alabama, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997).
“When affirming a similar instruction in McWhorter [v. State, 781 So.2d 257 (Ala.Crim.App.1999) ], this Court noted that the instruction did not inform the jury that the court had already made a determination on the voluntariness of the defendant’s statements to police. The same is true of the instruction given in this case. In fact, we have approved the use of substantially similar instructions in Gaddy v. State, 698 So.2d 1100, 1120 (Ala.Crim.App.1995).”
Blackmon v. State, 7 So.3d 397, 436 (Ala.Crim.App.2005), cert. denied, Blackmon v. Alabama, 556 U.S. 1209, 129 S.Ct. 2052, 173 L.Ed.2d 1136 (2009). See also Ready v. State, 574 So.2d 894, 900 (Ala.Crim.App.1990) (“Because the trial court clearly informed the jury that they were to make the ultimate determination as to whether the confession was voluntary, any error in *477 the trial court’s statements was harmless”).
In affirming a similar jury instruction, we recently stated:
“In Williams v. State, 782 So.2d 811 (Ala.Crim.App.2000), we considered a jury instruction that was virtually identical to the instruction in this case. In finding no reversible error, we stated:
“ ‘After reviewing all of the trial court’s instructions regarding confessions in the context of its entire oral charge, we conclude that they were not improper. They did not inform the jury that the trial court had determined that the appellant voluntarily made the statements, and they clearly instructed the jury that it was ultimately responsible for determining whether the appellant voluntarily made the statements. See Bush v. State, 523 So.2d 538 (Ala.Cr.App.1988); Ex parte Singleton, 465 So.2d 443 (Ala.1985).’
“782 So.2d at 838. Earlier in Singletary v. State, 473 So.2d 556, 575 (Ala.Crim.App.1984), we upheld a similar instruction and noted:
“ ‘There is some merit, we think, in the exception taken by defense counsel as to that part of the court’s oral charge in which he said “that confessions of guilt or statements against interest, when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of justice,” but upon consideration of the full context of the statement, we are convinced that it was not substantially harmful to defendant. Whatever tendency there . was unfavorable to the defendant as to evidence of confessions or admissions was offset by what the court said favorable to defendant on the subject.’ ”
Doster v. State, 72 So.3d 50, 99-100 (Ala.Crim.App.2010). We likewise find no plain error in the circuit court’s instructions on confession. See Doster.
. G.
Whatley argues that the court’s instructions on reasonable doubt were erroneous because, he says, they lessened the State’s burden of proof and violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). There was no objection to the court’s instructions on reasonable doubt; thus, we review this claim for plain error. See Rule 45A, Ala.R.App. P.
The court gave the following instruction: “A reasonable doubt is not a mere guess or a surmise and it is not a forced or capricious doubt. A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. Reasonable doubt is proof of such a convincing character that you would be willing to rely on it and act upon it without hesitation regarding the most important of your personal affairs.
“Now, if after considering all of the evidence in this case you have an abiding conviction of the truth of the charge and that the State has proven to you beyond a reasonable doubt all of the elements of the offenses under the instructions that I’m giving you, then you are convinced beyond a reasonable doubt. It would be your duty to convict the Defendant. Now the reasonable doubt which entitles a Defendant to an acquittal or a not guilty verdict, is not a mere fanciful, vague, conjectural or speculative doubt but a reasonable doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable, fair-minded and conscientious men and *478 women would entertain under the circumstances. Now you will observe that the State is not required to convince you of the Defendant’s guilt beyond all doubt, but simply beyond all reasonable doubt. If, after comparing and considering all of the evidence in the case, your minds are left in such a condition that you cannot say that you have an abiding conviction of the Defendant’s guilt, then .you are not convinced beyond a reasonable doubt and the Defendant would be entitled to a not guilty verdict.”
(R. 1361-63; emphasis added.)
The United State Supreme Court in Cage v. Louisiana held that use of terms “substantial” and “grave” to define reasonable doubt “suggest[s] a higher degree of doubt than is required for acquittal under the reasonable-doubt standard.” Cage, 498 U.S. at 41. The court’s instructions in this case were similar to the Alabama Pattern Jury Instructions on reasonable doubt and did not contain the language condemned by the United States Supreme Court in Cage v. Louisiana.
Although “[t]he appellate courts of this state endorse the use of the Alabama Pattern Jury Instructions in criminal cases,” see Ex parte McGriff, 908 So.2d 1024, 1033 (Ala.2004), we have also recognized that “[t]here may be some instances when using those pattern charges would be misleading or erroneous.” Ex parte Wood, 715 So.2d 819, 824 (Ala.1998), cert, denied, Wood v. Alabama, 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998). However, “‘We have upheld a similar reasonable doubt instruction against a claim of plain error.’ Smith v. State, 756 So.2d 892 (Ala. Cr.App.1998).” Smith v. State, 795 So.2d 788, 831 (Ala.Crim.App.2000), cert, denied, 795 So.2d 842 (Ala.2001), cert, denied, Smith v. Alabama, 534 U.S. 872, 122 S.Ct. 166,151 L.Ed.2d 113 (2001).
“The instruction on reasonable doubt that the trial court provided to the jury here incorporated the language found in the Alabama Pattern Jury Instructions on reasonable doubt. The pattern jury instructions inform jurors that their doubt cannot be based on ‘a mere guess or surmise’ but must be based on ‘reason and common sense.’ It also informs jurors that reasonable doubt that ‘entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt.’ Alabama Pattern Jury Instructions: Criminal, Instructions 1.4 and 1.5 (3d ed.1994). ““A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.”’ Wilson v. State, 111 So.2d 856 (Ala. Crim.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App. 1997), affd, 725 So.2d 1063 (Ala.1998), cert, denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).’ Snyder v. State, 893 So.2d 488, 550 (Ala.Crim. App.2003).”
Hams v. State, 2 So.3d 880, 913 (Ala.Crim.App.2007), cert. denied, Harris v. Alabama, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009). The circuit court’s instructions on reasonable doubt did not constitute plain error.
H.
Whatley next argues that the court’s instruction that “your vote has to be twelve zero no matter — twelve zero” (R. 1373) led the jury to believe that it had no option but to reach a verdict. There was no objection to this instruction; therefore, we review this claim for plain error. See Rule 45A, Ala. RApp. P.
When reviewing a similar instruction, we stated: “The trial court merely instructed the jury that any verdict it reached must be unanimous. There was no error in this *479 instruction.” Smith v. State, 756 So.2d 892, 926 (Ala.Crim.App.1997), affirmed, 756 So.2d 957 (Ala.2000), cert, denied, Smith v. Alabama, 581 U.S. 830, 121 S.Ct. 82,148 L.Ed.2d 44 (2000). Here, the court was merely instructing the jury that its vote had to be unanimous; thus, we find no plain error.
In this section of Whatley’s brief, he also argues that the circuit court erred in instructing the jury that it was prohibited from reading back testimony. He asserts that this instruction violated United States v. Criollo, 962 F.2d 241 (2d Cir. 1992). Whatley did not object to this instruction; thus, we are limited to determining whether there is plain error. See Rule 45A, Ala. R.App. P.
The following occurred before closing arguments in the guilt phase:
“[T]his is a chance that [the attorneys] have to argue what they think the evidence has been in the case. Notice I say they think the evidence has been. Tail are the judges of the evidence. If at any time the attorneys tell you, remind you, whatever that the evidence was a certain thing and you don’t remember it that way, it’s your memory that controls because as I said you’re the judges of the facts of the case. Occasionally in a closing argument an attorney may say, the evidence was this and that. The other attorney may object saying, Judge, that’s not what the evidence was. Nine times out of ten I’m going to tell y’all you’re the judges of what the evidence was because we don’t really have an ability to play it back and tell you what the evidence was. That’s going to be up to you.”
(R. 1299-1300.)
In Criollo, the United States Court of Appeals for the Second Circuit held that the trial court “erred in announcing before jury deliberations began a prohibition against readbacks of testimony” after the defendant had advised the jury during closing arguments that it should request that testimony be reread. 962 F.2d at 244.
However, this case is factually distinguishable from Criollo. Here, the court did not announce a prohibition against “readbacks” and counsel did not state in closing that the jury should ask for testimony to be read back to it. Accordingly, we find no plain error in the circuit court’s comments to the jury.
I.
Whatley next argues that the court’s instructions on intoxication were erroneous because the court instructed the jury that the level of intoxication necessary to negate intent must be so great as to amount to insanity.
After the jury instructions were given at the guilt phase, defense counsel objected to the instruction on intoxication and asserted that it placed too high a burden on Whatley. (R. 1385.) The court stated that the instruction was consistent with Alabama caselaw.
The court instructed the jury as follows:
“Now, the Defendant has introduced evidence regarding voluntary intoxication. Intoxication in and of itself does not constitute a mental disease or defect under the law of Alabama. Intoxication, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense charged. But intoxication is not a defense to a criminal charge. It only goes towards the issue of intent. Because capital murder requires that the Defendant must have acted with intent, evidence that the Defendant may have been intoxicated — evidence that the Defendant may have been intoxicated may be considered by you not as a complete *480 or total defense to the charge, if, as a result of the intoxication the Defendant lacked capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The intoxication must be of such character and extent as to render the Defendant incapable of consciousness that he is committing a crime. Intoxication must be so excessive as to paralyze the mental facilities, that’s probably faculties, faculties we’ll say, and to render the Defendant incapable of forming or entertaining the design to take a life. The degree of intoxication necessary to negate specific intent and thus reduce the charge, must amount to insanity.”
(R. 1854-55.)
When discussing the defense of intoxication, we have stated:
“The Alabama Supreme Court discussed the degree of intoxication necessary to negate criminal intent in Ex parte Bank-head, 585 So.2d 112 (Ala.1991), on remand to, 585 So.2d 133 (Ala.Crim.App. 1991), affd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala. 1993). The Alabama Supreme Court stated:
“ Tn an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent .to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App.1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App. 1986) ]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant’s intoxication rendered it impossible for the defendant to form a particular mental state.’
“585 So.2d at 121.”
Saunders v. State, 10 So.3d 53, 99 (Ala.Crim.App.2007), cert. denied, Saunders v. Alabama, 556 U.S. 1258, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009).
In discussing a similar jury instruction on intoxication, we recently stated:
“Section 13A-3-2, Ala.Code 1975, specifically provides: ‘Intoxication in itself does not constitute mental disease or defect within the meaning of § 13A-3-1.’ Section 13A-3-l(a), Ala.Code 1975, provides: ‘It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts.’ ‘Voluntary intoxication “is not a defense to a criminal charge,” § 13A-3-2(a), nor does intoxication in and of itself “constitute mental disease or defect within the meaning of § 13A-3-1,” § 13A-3-2(d).’ Ware v. State, 584 So.2d 939, 946 (Ala. Crim.App.1991) (footnote omitted). ‘ “[A] trial court has broad discretion in fashioning a jury instruction, provided it accurately reflects the law and facts of the case.” ’ Flowers v. State, 922 So.2d 938, 954 (Ala.Crim.App.2005) (quoting Raper v. State, 584 So.2d 544, 545 (Ala.Crim.App.1991)). *481 “Because voluntary intoxication does not constitute a severe mental disease or defect for insanity purposes, the circuit court’s instructions to that effect were proper.”
Albarran v. State, 96 So.Bd 131, 167 (Ala.Crim.App.2011).
The circuit court’s instructions on intoxication were consistent with Alabama law and did not constitute error.

Penalty-Phase Issues

X.
Whatley next argues that the circuit court erred in allowing evidence of Whatley’s future dangerousness to be admitted at the penalty phase because, he says, it constituted evidence of a nonstatu-tory aggravating circumstance and was inadmissible.
The record indicates that, before the penalty phase, the prosecutor requested that he be allowed to present evidence of Whatley’s future dangerousness. The State asserted that this evidence was admissible pursuant to § 18A-5-45(d), Ala. Code 1975, which provides:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
Whatley objected and argued that admitting the evidence would “create a new aggravator.” The circuit court allowed the evidence to be admitted at the penalty phase. (R. 1413.)
The State presented evidence concerning Whatley’s behavior while he was incarcerated at the Mobile County jail. Testimony was presented that Whatley had disciplinary infractions while there and that he threatened another inmate. Whatley asserts that this evidence was not admissible at the penalty phase because it tended to establish a nonstatutory aggravating circumstance concerning his future dangerousness.
The United States Supreme Court has stated the following concerning evidence of a defendant’s future dangerousness:
“This Court has approved the jury’s consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant’s future dangerousness bears on all sentencing determinations made in our criminal justice system.”
Simmons v. South Carolina, 512 U.S. 154, 162, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).
Section 13A-5-45, Ala.Code 1975, states, in pertinent part:
“(c) At the sentencing hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51, and 13A-5-52....
“(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.”
(Emphasis added.)
In Alabama, in order to sentence a defendant to death, the aggravating circumstances must outweigh the mitigating circumstances. See § 13A-5-47(e), Ala.Code *482 1975. There is no aggravating circumstance that relates to a defendant’s future dangerousness. See § 13A-5-49, Ala.Code 1975. However, the appellate courts of Alabama have never restricted the admission of evidence at the penalty phase in a capital-murder case to evidence related solely to the aggravating circumstances and the mitigating circumstances. See Lee v. State, 44 So.3d 1145, 1174 (Ala.Crim. App.2009) (“[V]ictim impact evidence is admissible at the penalty phase of a capital trial.”); McGriff v. State, 908 So.2d 961, 1013 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004) (upholding admission of evidence at penalty phase that defendant said he had “‘done killed one m_ f_ and would kill again’ ”).
In Doster v. State, 72 So.3d 50, 120-21 (Ala.Crim.App.2010), we held that “evidence indicating future dangerousness was relevant and admissible in Alabama pursuant to § 13A-5-45(d), Ala.Code 1975.” The evidence in this case was relevant and admissible at the penalty phase of Whatley’s trial. The circuit court properly instructed the jury on the applicable aggravating circumstances and that, before a death sentence could be imposed, the aggravating circumstances must outweigh the mitigating circumstances.
Moreover, Whatley argued at the penalty phase that he had confessed to the murder/robbery, thereby helping the police; that he had had a “religious conversion” after killing Patel; and that he was remorseful for his actions. Whatley’s conduct in jail and the statements he made concerning harming other inmates were relevant to rebut evidence that Whatley presented in mitigation.
“Evidence of Clark’s prison disciplinary problems was clearly offered to rebut the evidence he had offered in mitigation that he was a ‘model inmate.’ (R. 1547.) The evidence was relevant and probative to sentencing and was, thus, properly admitted. See, e.g., Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert, denied, 791 So.2d 1043 (Ala.2000), cert, denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001)(evidence of the defendant’s prior misdemeanor conviction and his suspension from high school was properly admitted to rebut the defendant’s mitigation evidence); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), affd, 548 So.2d 547 (Ala.), cert, denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)(evidence that the defendant was having an incestuous relationship with his daughter was properly admitted to rebut the defendant’s mitigation evidence regarding his good character).”
Clark v. State, 896 So.2d 584, 597 (Ala.Crim.App.2000), cert. denied, Clark v. Alabama, 545 U.S. 1130, 125 S.Ct. 2930, 162 L.Ed.2d 870 (2005). For these reasons, we find no error in the admission of this evidence at the penalty phase.
XI.
Whatley argues that the court erred in questioning witnesses and commenting on the evidence presented. There were no objections to any of the circuit court’s actions in this regard; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Rule 614(b), Ala. R. Evid., provides: “The court may interrogate witnesses, whether they were called by the court or by a party.”[10] See also Rule *483 19.2(b)(2), Ala. R.Crim. P. In discussing the scope of Rule 614(b), we have stated:
“Although a trial court may question witnesses to clarify or to develop facts in a nonprejudicial matter, it must not develop a ‘partisan stance.’ See United States v. Medina-Verdugo, 637 F.2d 649, 653 (9th Cir.1980). Moreover, the trial court’s participation in the trial proceedings must never reach the point where it appears clear to the jury that the court believes the accused is guilty. United States v. Beaty, 722 F.2d 1090 (3rd Cir.1983). See Richardson v. State, 403 So.2d 293, 295 (Ala.Crim.App.1981) (‘Jurors give great weight to testimony produced by questions from the trial judge.’).”
Vrocker v. State, 813 So.2d 799, 803 (Ala.Crim.App.2001).
“ ‘A trial judge may “pose questions to a witness for the purpose of clarifying the issues for the jury’s consideration and to aid in the orderly conduct of the trial process.” Richardson v. State, 403 So.2d 297 (Ala.1981). “The trial judge has the right to propound such questions to witnesses as may be necessary to elicit certain facts, ...; and it not only is the court’s prerogative to so act, but its duty, if the court deems it necessary to elicit proper evidence bearing on the issues.” Rice v. Hill, 278 Ala. 342, 343, 178 So.2d 168, 169 (1965) (citations omitted). “[Wjith certain exceptions, no rule of law exists which limits the power of a judge in a criminal trial to interrogate a witness during his examination. He may ask any question which either the state or the accused had the right to ask, but which has been omitted, if the answer may be relevant.” Holmes v. State, 22 Ala.App. 373, 115 So. 849 (1928). “The unquestioned province of the court — in fact, the solemn and sacred duty of a trial judge — is the development and establishment of the truth, and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to -witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other.” Brandes v. State, 17 Ala.App. 390, 391, 85 So. 824, 825 (1920).’ ”
Wynn v. State, 804 So.2d 1122, 1141 (Ala.Crim.App.2000), cert. denied, 804 So.2d 1152 (Ala.2001), cert, denied, Wynn v. Alabama, 535 U.S. 972, 122 S.Ct. 1440, 152 L.Ed.2d 383 (2002), quoting Timmons v. State, 487 So.2d 975, 981 (Ala.Crim.App.1986).
“Because the appellate courts of Alabama have had few occasions to address this issue we have looked to other courts. The Sixth Circuit has recognized that there are three situations in which a trial court may have reason to interject itself into the trial proceedings. See United States v. Dandy, 998 F.2d 1344 (6th Cir.1993), cert, denied, 510 U.S. 1163, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994).
“ ‘First, judicial intervention may be necessary for clarification in a lengthy and complex trial. Second, it may be necessary for clarification where attorneys are unprepared or obstreperous or if the facts are becoming confused and neither side is able to resolve the confusion. Third, judicial intervention may be necessary if a witness is difficult or if the witness’s testimony is not credible and the attorney fails to adequately probe the witness or if the witness becomes inadvertently confused.’ *484 “United States v. Dandy, supra at 1353. See United States v. Jerde, 841 F.2d 818 (8th Cir.1987) (‘Although the trial court may interject isolated questions to clarify ambiguities, it “cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government’s proof or to question the credibility of the defendant.” ’). Isaac v. State, 590 N.E.2d 606 (Ind.Ct.App.), opinion adopted in part, vacated in part, 605 N.E.2d 144 (Ind.1992), cert, denied, 508 U.S. 922, 113 S.Ct. 2373, 124 L.Ed.2d 278 (1993) (‘When a trial judge undertakes to impeach or discredit, he or she abandons the role of safeguarding the fact-finding process and adopts the role of advocate.’). James v. State, 388 So.2d 35 (Fla.Ct.App.1980) (case reversed because the trial court commented, on the defendant’s testimony, that it was ‘the rankest form of hearsay that there is’).
“The Supreme Court in Kmart Gorp. v. Kyles, [723 So.2d 572] at 576 [ (Ala.1998) ], stated that before a trial judges’s interrogation of a witness may warrant reversal, the trial judge must have abused its discretion and the actions must have resulted in the accused’s being denied a fair trial. In Wilson v. Anderson, 420 Pa.Super. 169, 174 n. 1, 616 A.2d 34 (1992), a Pennsylvania court stated:
“1 “ ‘A new trial is required ... only when the trial judge’s questioning amounts to an abuse of discretion. Commonwealth v. Elmore, 241 Pa. Superior Ct. 470, 476, 362 A.2d 348, 351 (1976). Because a charge of this nature is of the most serious type, however, “‘the record must clearly show prejudice, bias, capricious disbelief or prejudgment’ ” before an abuse of discretion will be found. Kenworthy v. Burghart, 241 Pa. Superior Ct. 267, 271-72, 361 A.2d 335, 338 (1976).’” quoting Fleck v. Durawood Inc., 365 Pa.Super. 123, 128, 529 A.2d 3, 5-6 (1987).’ ”
Smith v. State, 797 So.2d 503, 533 (Ala.Crim.App.2000), cert, denied, 797 So.2d 549 (Ala.), cert. denied, Smith v. Alabama, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001).
In this case, the State presented the testimony of Dr. Charles Smith, a psychiatrist, during the penalty phase. Dr. Smith testified that he was the psychiatrist for the Mobile Metro jail and that he evaluated Whatley in June 2005, soon after he was arrested. It was Dr. Smith’s opinion that Whatley suffered from polysubstance abuse, a mood disorder, and that he had a history of bipolar disorder. The following occurred during Dr. Smith’s testimony:
“The Court: Doctor, ... you were talking I believe in general about crimes associated with bipolar disorder I believe.
“[Dr. Smith]: Yes.
“The Court: I think you said incidents of crimes.
“Isn’t it a fact that most of those crimes are associated with the manic state and they’re crimes such as writing bad checks?
“[Dr. Smith]: Yes, sir.
“The Court: Could you explain a little bit of how, in general not this case, but what maybe I’m referring to about in the manic state the crimes that people that are generally committed?
“[Dr. Smith]: Well, you think of mania or a manic stage is a stage in terms of speed or pace. A person is too fast. He has more energy than usual, needs less sleep, is very expansive in his thinking and quick to turn thought into actions and just shows very poor judgment and to avoid restraints if he possibly can and *485 to carry out whatever strikes him as a good idea at the time. I think an interesting example of what I’m talking about is it’s a good feeling with a person when he’s manic. He’s too fast, he can conquer the world. So you virtually never see a patient who is manic seek treatment. You don’t hear from them. They don’t have a problem. They don’t have any insight. They feel good. Rather you hear from the family or the police or the national guard or something of that sort. They do make trouble for themselves because of that poor judgment and lack of restraint and feeling that they can conquer anything or achieve anything.
“The Court: For instance, going on a spending spree when they have no money is a typical type?
“[Dr. Smith]: Yes, sir, good example, yes.
“The Court: I actually have a neighbor — actually two neighbors in the same family and it’s kind of amazing. I mean this neighbor was out, pretty sad, weeding her garden in the dark with her nice clothes on just a mile a minute.”
(R. 1479-80.) Shortly thereafter, the following occurred:
“[Prosecutor]: Dr. Smith, let’s concentrate on what we have here today; okay. And what we have here today is we’re talking about Donald Whatley; okay? “[Dr. Smith]: Yes.
“[Prosecutor]: And you’re not telling the ladies and gentlemen of this jury that Donald Whatley is crazy, are you?
“[Dr. Smith]: No.
“[Prosecutor]: And you’re not telling the ladies and gentlemen of this jury that Donald Whatley suffers from a mental disease or defect that would have rendered him not guilty by reason of mental disease or defect, are you?
“[Dr. Smith]: No, I don’t have any opinion on that.
“[Prosecutor]: In fact, you’re not even a forensic psychologist, are you?
“[Dr. Smith]: No, and I’m not a forensic psychiatrist.
“[Prosecutor]: And so you have no idea what he suffered from- in 2003 at the time that he committed this murder, do you?
“[Defense counsel]: Your Honor, if it pleases the court leading. Telling him you don’t do this or you do that.
“The Court: Overrule. I’m going to add if anything. You don’t have any idea what Mr. Whatley was suffering from the state of mental disorder, if anything, back in 2003; is that right or wrong?
“[Dr. Smith]: That’s correct.”
(R. 1486.)
Whatley called Dr. William Alexander Morton, a psychopharmacologist, to testify on his behalf. Defense counsel asked Dr. Morton whether he had seen evidence in Whatley’s records that Whatley had ever had hallucinations:
“[Dr. Morton]: I did see that. I did see one time where he thought the unit clerk was attempting to kill his father and he had to be restrained. He was delusional. His father was still alive at that time and he had to be restrained and put in seclusion because he was convinced that he was being affected by this ward clerk. And it’s not clear exactly what was causing that. It could have been substances. It could have been bipolar. It could have been both.
“The Court: I guess it could have been the unit clerk too? Don’t really know.
“[Dr. Morton]: No, I don’t think so. I don’t think so. The people that were *486 working there did not think the unit clerk was doing that.
“The Court: Good. Good.”
(R. 1587-88.)
The circuit court instructed the jury as follows:
“I have no opinion regarding the facts of the case. It would be improper for me to have an opinion regarding the facts of the case. Do not let any ruling I have made nor anything I may have said give you an impression that I think one way or another regarding the facts of the ease. Your duty is to determine the facts, take the testimony of the witnesses together with all the proper and reasonable inferences therefrom, apply your common sense, and in an impartial and honest way determine what you believe the truth to be.”
(R. 1370-71.)
After carefully reviewing the record and the instructions given by the court, we find no evidence that Whatley suffered any prejudice as a result of the circuit court’s questioning of Dr. Smith and Dr. Morton. Accordingly, we find no plain error in the circuit court’s actions. See Smith.
XII.
Whatley next argues that the court erred in allowing Patrick Buttell to testify at the penalty phase concerning Whatley’s mental state because, he argues, his testimony violated Rule 702, Ala. R. Evid.
Buttell testified at the penalty phase that he is a licensed clinical social worker and that, at the time that Whatley was in the Mobile Metro jail, he was working at that facility. He stated that his primary role there was to
“sort out the ones that really had illness, needed help, versus those that were malingering. The second part of that, a key part of that, was evaluating whether they were a danger to themselves or others in which case you would put them into seclusion and separate them from the other inmate population.”
(R. 1452.) Buttell said that, when he interviewed Whatley in June 2005, Whatley was “extremely tense, uptight, agitated mentally and emotionally which means he’s very tight and tense and I was very concerned that he could possibly harm some of the inmates.” (R. 1452.) He stated that he felt that Whatley was a danger to himself and to others. There was no objection to Buttell’s testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The Rules of Evidence do not apply to sentencing hearings.' Rule 1101(b)(3), Ala. R. Evid., provides that the Rules do not apply to “[pjroceedings for extradition or rendition; preliminary hearings in criminal cases; sentencing, or granting or revoking probation-” Therefore, Rule 702, Ala. R. Evid., did not bar Buttell’s testimony at the penalty phase.
Also, § 13A-5-45(d), Ala.Code 1957, provides:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
Buttell’s testimony was relevant and admissible at the penalty phase.
Moreover, Buttell’s testimony rebutted Whatley’s assertions that he was a changed man who had found religion and *487 that he was remorseful for his actions. The circuit court committed no error in allowing Buttell’s testimony at the sentencing hearing.
XIII.
Whatley next argues that the trial court prevented him from presenting testimony concerning the mitigating effect of addiction when it sustained the State’s objection to Dr. Morton’s testimony.
At the penalty phase, Dr. Morton, a psychopharmacologist, testified to the following:
“[Defense counsel]: Now, this next sets out voluntary intoxication?
“[Dr. Morton]: Yes and how it starts— You know, everybody starts off by making a choice to use. I think later on it’s seldom a voluntary choice. Their brain is saying you’ve got to use.
“[Defense counsel]: And that’s to deal with the effects of the withdrawal?
“[Dr. Morton]: And because it’s just tricking the brain. It’s saying you got to use. You don’t have to but it’s tricking the brain.
“[Prosecutor]: And, Judge, I’m going to object to the latter part. There’s been no testimony whatsoever regarding anything being involuntary in this case.
“The Court: Yeah, I’ll sustain that objection. Disregard anything about involuntary. Involuntary is normally defined as somebody spiking your drink or somebody slipping some substance in without your awareness. I think the Doctor is using it as a different term but we’re not going to get into involuntary in this case.”
(R. 1583-84.) Whatley did not object to the court’s ruling; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Dr. Morton had earlier testified that Whatley was an addict and he stated:
“Addiction is a disease, truly a brain disease that you have for your life. You relapse, you compulsively use, you seek it and you frequently have withdrawal and you use it despite horrible things going on in your life.
“[Defense counsel]: Did you see this in the records with Mr. Whatley?
“[Dr. Morton]: I did. I saw him basically lose everything in his life. I saw him lose his self esteem. I saw him lose his mental health. I saw him lose his physical health. I saw him lose access to his son. I saw him lose work. I saw him not have a place to live, all pretty much related to substance use in an attempt to treat a mood disorder. “[Defense counsel]: Self medicate?
“[Dr. Morton]: Self medicate?
“[Defense counsel]: Now, what you’re setting out here is the switch from when people stop choosing to use and just use because they have to?
“[Dr. Morton]: It’s essentially a switch. Something occurs in the brain where people get on a path on an access road. They never get off that access road once that switch occurs. And we’re trying to find the biochemical reason of how people get over there so they have lost that inability to control their use. That’s the essential difference between an addict and non-addict is someone that has the disease of addiction cannot control their use and never will be. And I would say they don’t have the biologic ability to stop; they can’t stop.”
(R. 1575-76.)
Thus the record of the penalty phase shows that Whatley was allowed to present testimony concerning the effect of an addiction; therefore, this claim is not supported by the record.
*488 XIV.
Whatley next argues that the admission of evidence regarding Whatley’s murder conviction in Texas was more prejudicial than probative and that the evidence should have been excluded.
At the beginning of the penalty phase, the State asserted that one of the aggravating circumstances it was relying on to support a death sentence was that Whatley had previously been convicted of a crime of violence, an aggravating circumstance defined in § 13A-5-49(2), Ala.Code 1975. The prosecutor asserted that he intended to present evidence that Whatley had three prior convictions for violence: a murder conviction in Texas, an assault conviction in North Carolina, and a robbery conviction in North Carolina. Whatley conceded that the convictions in North Carolina were admissible but argued that the murder conviction was more prejudicial than probative. (R. 1406.) The court overruled the objection and allowed the Texas guilty-plea murder conviction to be admitted at the penalty phase.
Section 13A-5-49(2), Ala.Code 1975, defining aggravating circumstances, states, in pertinent part: “The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person.” (Emphasis added.) Section 13A-5-39(6) defines “previously convicted” as a conviction “occurring before the date of the sentence hearing.”
The Texas murder conviction occurred before the sentencing hearing in this case. Thus, “the trial court properly admitted the appellant’s prior conviction into evidence because, although the conviction occurred after the commission of the current offense, it occurred before the date of the sentence hearing.” Ray v. State, 809 So.2d 875, 880-81 (Ala.Crim.App.), cert. denied, 809 So.2d 891 (Ala.2001), cert. denied, Ray v. Alabama, 534 U.S. 1142, 122 S.Ct. 1096, 151 L.Ed.2d 993 (2002).
Also, we have upheld the admission of evidence of prior capital-murder convictions at the penalty phase of a capital-murder trial against a claim that the conviction was too prejudicial. See Ray v. State, supra.; Jones v. State, 450 So.2d 165 (Ala.Crim.App.1983), affirmed, 450 So.2d 171 (Ala.), cert. denied, Jones v. Alabama, 469 U.S. 873,105 S.Ct. 232, 83 L.Ed.2d 160 (1984). In Ray, we stated:
“With regard to the claim that the jury would accord too heavy a weight to the appellant’s prior conviction because it was a capital offense, there is nothing in the record that indicates that the jury was influenced by prejudice or by any other arbitrary factor.”
809 So.2d at 881.
According to § 13A-5-45(e), Ala.Code 1975, “the State shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances.” Certainly, evidence of Whatley’s prior conviction for murder in the State of Texas was relevant and admissible to prove this aggravating circumstance. The record does not suggest that undue emphasis was placed on Whatley’s Texas conviction and evidence of that conviction was correctly admitted at the penalty phase of Whatley’s trial.
XV.
Whatley next argues that his death sentence must be vacated based on the Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because, he says, the jury never specifically determined the aggravating circumstances that supported the death sentence. He further asserts that the Alabama Supreme Court’s holding in Ex parte Waldrop, 859 So.2d 1181 (Ala.), cert, de *489 nied, Waldrop v. Alabama, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003), is contrary to the United States Supreme Court’s holding in Ring and therefore should be overruled.
The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), held that any fact that increases the sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. This holding was extended to death-penalty cases in Ring v. Arizona. In Waldrop, the Alabama Supreme Court held:
“[W]hen a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ ”
859 So.2d at 1188.
This Court has no authority to overrule Alabama Supreme Court precedent. See § 12-3-16, Ala.Code 1975. Based on the Supreme Court’s decision in Waldrop, because Whatley was convicted of murdering Patel during the course of a robbery, the jury’s verdict at the guilt stage established the existence of one aggravating circumstance, § 13A-5-49(4), Ala.Code 1975, thereby making Whatley eligible for the death penalty. According to Waldrop, Whatley’s sentence does not violate Ring v. Arizona.
XVI.
Whatley next argues that § 13A-5-49(4), Ala.Code 1975, the aggravating circumstance that the murder was committed during certain enumerated felonies, is unconstitutional because, he says, it fails to narrow the class of death-penalty eligible offenders, given that the felony is both an element of the capital-murder offense and an aggravating circumstance. Specifically, he asserts that double-counting robbery as both an element of the underlying offense is unconstitutional.
“[The defendant’s] claims that the trial court erred by double-counting the aggravating circumstances and that this double-counting is unconstitutional because it fails to narrow the class of cases eligible for the death penalty are without merit.” McMillan v. State, 139 So.3d 184, 265 (Ala.Crim.App.2010). See also Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010); Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010); McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2003), cert. denied, McGowan v. Alabama, 555 U.S. 861, 129 S.Ct. 136, 172 L.Ed.2d 104 (2008); Jackson v. State, 836 So.2d 915 (Ala.Crim.App.1999). Section 13A-5-49(4), Ala.Code 1975, is not unconstitutional.
XVII.
Whatley next argues that evolving standards of decency have rendered Alabama’s method of execution, lethal injection, unconstitutional. He argues: “Alabama’s undeveloped procedures for administering lethal injection pose a substantial risk of inflicting unnecessary pain and therefore violate evolving standards of decency.” (Whatley’s brief, at p. 119.)
The Alabama Supreme Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008), cert. denied, Belisle v. Alabama, 557 U.S. 939, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009), addressed this issue and held that Alabama’s method of performing lethal injection did not constitute cruel and unusual punishment. The Supreme Court stated:
“The Eighth Amendment to the United States Constitution provides: ‘Excessive bail shall not be required, nor excessive fines imposed, nor cruel and *490 unusual punishments inflicted.’ ‘Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, — something more than the mere extinguishment of life.’ In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘Our cases recognize that subjecting individuals to a risk of future harm— not simply actually inflicting pain— can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be “sure or very likely to cause serious illness and needless suffering,” and give rise to “sufficiently imminent dangers.” Helling v. McKinney, 509 U.S. 25, 33, 34-35 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a “substantial risk of serious harm,” an “objectively intolerable risk of harm” that prevents prison officials from pleading that they were “subjectively blameless for purposes of the Eighth Amendment.” Farmer v. Brennan, 511 U.S. 825, 842, 846, and n. 9 (1994).’
“553 U.S. at 49-50, 128 S.Ct. at 1530-31.
“In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing ‘that there is a significant risk that the procedures will not be properly followed — in particular, that the sodium thiopental will not be properly administered to achieve its intended effect — resulting in severe pain when the other chemicals are administered.’ 553 U.S. at 49, 128 S.Ct. at 1530. Beli-sle’s claim, like the claims made by the inmates in Baze, ‘hinges on the improper administration of the first drug, sodium thiopental.’ Baze, 553 U.S. at 53, 128 S.Ct. at 1533.
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at 62-63, 128 S.Ct. at 1538, and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, 553 U.S. at 61,128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, 553 U.S. at 121, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, 553 U.S. at 50, 128 S.Ct. at *491 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
Belisle, 11 So.3d at 338-89. We reiterate that Alabama’s method of execution is neither cruel nor unusual and does not violate the Eighth Amendment to the United States Constitution. Accordingly, Whatley is due no relief on this claim.
XVIII.
Whatley argues that the prosecutor argued facts not in evidence during his closing argument in the penalty phase. There were no objections to the prosecutor’s closing arguments; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“ While this failure to object does not preclude review in a capital case, it does weigh against any claim, of prejudice’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), affirmed, 577 So.2d 531 (Ala.), cert, denied, Kuenzel v. Alabama, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)(emphasis omitted).
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bank-head [v. State], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 [528] U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bank-head, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), affirmed, 814 So.2d 970 (Ala.2001), cert. denied, Ferguson v. Alabama, 535 U.S. 907,122 S.Ct. 1208,152 L.Ed.2d 145 (2002). “ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), cert. denied, Reeves v. Alabama, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App. *492 1987), reversed on other grounds, Ex parte Rutledge, 528 So.2d 1118 (Ala.1988).
Whatley first argues that counsel argued facts not in evidence when he said in closing: “Scott Cook [an inmate] stood before you and told you that Donald What-ley, if he had not been arrested, told him that he was going to go on a killing spree.” (R. 1680.)
The record shows that at the penalty phase, Cook testified that he was incarcerated with Whatley for four weeks in a cell on the medical block. He said that What-ley told him about murdering Patel and about murdering a woman in Texas. He said that when Whatley was talking to him about the murder in Texas, he was “laughing the whole time.” (R. 1502.) Cook also testified that Whatley got into a fight in jail and told the guy that he was fighting with that he had already killed two people. He asked him if he wanted to be his third. (R. 1502.) There was also testimony that Whatley frequently thought of hurting other inmates. Although there was no direct testimony from Cook that Whatley told him he was going to go on a killing spree, this was a reasonable inference that could have been drawn from the testimony that was presented at the penalty phase. “We have reviewed the complained-of comment, both in the context of the entire closing argument and in the context of the entire trial, and we find no error.” Reeves, 807 So.2d at 46. This comment did not so infect the trial with unfairness as to deny Whatley due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Accordingly, we find no plain error.
Whatley also asserts that the prosecutor improperly argued that What-ley had no brain damage when, he asserts, the State’s own expert testified that he had brain damage. Dr. Van Rosen, a clinical and forensic psychologist, testified in rebuttal during the penalty phase that the results of the CT scans and the MRI scans in Whatley’s hospital records appeared to be “essentially normal.” (R. 1618.) During closing argument in the penalty phase, the prosecutor argued that Whatley’s CT scans and MRI scans showed no brain damage. (R. 1674.) This comment was supported by Dr. Rosen’s testimony and was a permissible argument at the penalty phase. Moreover, the jury was instructed that the comments of counsel were not evidence in the case. “[T]he circuit court on several occasions instructed the jury that arguments of counsel were not evidence. ‘We presume that the jury follows the circuit court’s instructions.’” Brown v. State, 11 So.3d 866, 907 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert, denied, Broum v. Alabama, 557 U.S. 938, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009). For these reasons, we find no plain error in the prosecutor’s closing arguments in the penalty phase.
XIX.
 Whatley next challenges several jury instructions that the circuit court gave in the penalty phase.
“A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). A trial court’s oral charge to the jury must be construed as a whole, and must be given a reasonable — not a strained — construction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984).”
Williams v. State, 710 So.2d 1276, 1305 (Ala.Crim.App.1996), affirmed, 710 So.2d 1350 (Ala.1997), cert. denied, Williams v. Alabama, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). See also Johnson v. *493 State, 820 So.2d 842, 874 (Ala.Crim.App.2000), affirmed, 820 So.2d 888 (Ala.2001), cert. denied, Johnson v. Alabama, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002). “When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ ” Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999), affirmed, 795 So.2d 785 (Ala.2001), cert. denied, Williams v. Alabama, 534 U.S. 900, 122 S.Ct. 226,151 L.Ed.2d 162 (2001).
“ ‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’ ”
Broadnax v. State, 825 So.2d 134,196 (Ala.Crim.App.2000), affirmed, 825 So.2d 233 (Ala.2001), cert. denied, Broadnax v. Alabama, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998), reversed on other grounds, Ex parte Pilley, 789 So.2d 888 (Ala.2000).
With these principles in mind, we review the challenged instructions.
A.
First, Whatley argues that the court erred in instructing the jury not to be influenced by sympathy in its deliberations. Specifically, he asserts that under Alabama law any aspect of the defendant’s character may be considered as a mitigating factor and that sympathy was a relevant aspect of his character.
The court gave the following instruction: “[Y]ou must avoid any influence of passion, prejudice or any other arbitrary factor. Your deliberations and verdict must be based upon the evidence that you have seen and heard and the law which I have instructed you both here and in the penalty — in the guilt phase. There’s no room for the influence of passion, prejudice, arbitrary factors or certainly prejudice or emotion.”
(R. 1697.) Whatley did not object to this instruction; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the United States Supreme Court held that “an instruction informing jurors that they ‘must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling’ during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.” 479 U.S. at 539. Relying on California v. Brown, we have routinely upheld similar instructions. See Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011); Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009); Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App.1992), affirmed, 627 So.2d 1054 (Ala.1993), cert. denied, Jenkins v. Alabama, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
Accordingly, we find no plain error in the court’s instructions on sympathy.
B.
Second, Whatley argues that the circuit court erred in failing to instruct the *494 jury that the court could consider only an aggravating circumstance the jury had unanimously found to exist. Whatley did not object to the court’s instructions on finding aggravating circumstances; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The court specifically instructed the jury that, in order to find the existence of any mitigating circumstance, the jury did not have to unanimously agree, but that the aggravating circumstances had to be proven beyond a reasonable doubt to the jury. The court further instructed that one aggravating circumstance, that the murder was committed during the course of a robbery, had been proven by the jury’s verdict in the guilt phase and that it was to consider the other two aggravating circumstances the State alleged were present in the case.
“[T]he charge clearly put the jury on notice that unanimity was not required for a finding that mitigating circumstances existed, but was required for a finding that aggravating circumstances existed. In other words, the jury was informed that it must — as a unit — unanimously find the existence of any aggravating circumstance it considered in arriving at a recommended sentence.”
Ex parte McNabb, 887 So.2d 998, 1006 (Ala.), cert. denied, McNabb v. Alabama, 543 U.S. 1005, 125 S.Ct. 606, 160 L.Ed.2d 466 (2004).
“[W]e find that any possible error that may have occurred from the trial court’s failure to use the word ‘unanimous’ did not amount to plain error. The court’s use of the terms ‘the jury’ and ‘each of you’ implies that any findings of aggravating circumstances had to be unanimous. ‘We must evaluate instructions like a reasonable juror may have interpreted them.’ Stewart v. State, 601 So.2d 491, 507 (Ala.Cr.App.), opinion after remand, 659 So.2d 120 (Ala.Cr.App. 1992), affd in part, rev’d in part on other grounds, 659 So.2d 122 (Ala. 1993).”
Taylor v. State, 808 So.2d 1148, 1211 (Ala.Crim.App.2000), affirmed, 808 So.2d 1215 (Ala.2001), cert. denied, Taylor v. Alabama, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002). The circuit court’s instructions on aggravating circumstances did not constitute plain error.
C.
Third, Whatley argues that the court erred in failing to give examples of non-statutory mitigation evidence when charging the jury in the penalty phase.
Whatley requested that the court charge the jury on the specific examples of mitigation he had presented at the penalty phase. (C.R. 439.) The court instructed the jury on the statutory mitigating circumstances contained in § 13A-5-51, Ala. Code 1975, and then gave the following instruction:
“Now, keep in mind that a mitigating circumstances does not have to be included in the list that I just read you in order for you to consider it — in order for it to be considered by you. In addition to the mitigating circumstances, I have read to you, mitigating circumstances shall include any aspect of the defendant’s character, background, or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without the possibility of parole rather than death.”
(R. 1691.)
“This Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant.” Brown v. State, 686 So.2d 385, 403 *495 (Ala.Crim.App.1995), affirmed, 686 So.2d 409 (Ala.1996), cert, denied, Brown v. Alabama, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). See also Albarran v. State, 96 So.3d 131 (Ala.Crim.App.2011); James v. State, 61 So.3d 357 (Ala.Crim. App.2010). The circuit court did not err in failing to instruct the jury from a list of specific mitigating circumstances.
XX.
Whatley argues that the prosecutor improperly argued at the sentencing hearing that the victim’s family wanted Whatley to be sentenced to death. Whatley cites Booth v. Maryland, 482 U.S. 496,107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), to support this assertion.
At the sentencing hearing held before the circuit court, the prosecutor argued:
“[T]he family is in support of the jury’s recommendation that Donald Whatley be put to death, each and every member of his family is in support of that. And the State is asking that you stand behind the jury’s verdict and you sentence Donald Whatley to death.”
(R. 1720-21.) Whatley did not object to this argument; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In Booth, the United States Supreme Court held that it was reversible error to present victim-impact evidence at the penalty phase of a capital-murder trial. The court stated:
“One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and defendant.” 482 U.S. at 508. In 1991, the United States Supreme Court, partially reversed its holding in Booth, stating:
“We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on [victim impact], the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.”
Payne v. Tennessee, 501 U.S. 808, 826, 111 S.Ct. 2597,115 L.Ed.2d 720 (1991).
“ ‘ “However, the Payne court did not overrule the rule stated in Booth prohibiting consideration of a victim’s family members’ characterization and opinions about the crime, the defendant, and the appropriate sentence during the sentencing phase of a capital murder trial. See [Payne,] 501 U.S. at 830, n. 2.” ’ ”
Arthur v. State, 711 So.2d 1031, 1093 (Ala. Crim.App.1996), affirmed, 711 So.2d 1097 (Ala.1997), quoting Ex parte Rieber, 663 So.2d 999,1006-07 (Ala.1995). “Testimony from a victim’s family member as to a sentencing recommendation is generally not admissible in a capital case.” Woods v. State, 13 So.3d 1, 35 n. 6 (Ala.Crim.App.2007).
However, we have also stated:
“There is nothing in the trial court’s sentencing order that indicates that it considered, in sentencing Whitehead to death, the testimony of Whitten’s family [that the defendant should be sentenced to death]. We presume that the trial court disregarded any inadmissible or improper considerations in its sentencing determination. See Sockwell v. *496 State, 675 So.2d 4, 36 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).”
Whitehead v. State, 777 So.2d 781, 848 (Ala.Crim.App.1999), affirmed, 777 So.2d 854 (Ala.2000), cert. denied, Whitehead v. Alabama, 532 U.S. 907,121 S.Ct. 1233,149 L.Ed.2d 142 (2001). See also Burgess v. State, 723 So.2d 742, 766 (Ala.Crim.App.1997), affirmed, 723 So.2d 770 (Ala.1998), cert. denied, Burgess v. Alabama, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).
The same is true in this ease. Here, this evidence was presented only to the trial court; it was not introduced during the sentencing hearing before the jury. There is no indication in the sentencing order that it was considered by the circuit court when fixing Whatley’s sentence at death. Nor is there any other indication in the record that the court improperly considered this evidence. The circuit court acted in accordance with its duty and sentenced Whatley, taking into account only the proper determining factors. We find no plain error as to this matter.
XXI.
Whatley further argues that the cumulative effect of the errors requires that his conviction and sentence be reversed.
“ ‘The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis’s substantial rights at trial.’ ”
Sharifi v. State, 993 So.2d 907, 946-47 (Ala.Crim.App.2008), cert. denied, Sharifi v. Alabama, 555 U.S. 1010, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008), quoting Lewis v. State, 24 So.3d 480, 538 (Ala.Crim.App.2006).
Applying this standard to this case, we find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Whatley’s substantial rights. Accordingly, we find no cumulative error.

Sentencing Order

XXII.
Whatley asserts that the court erred in failing to consider and find certain mitigating circumstances which, he argues, included his mental illness and addiction.
The United States Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), held that a court must consider all evidence submitted by a capital-murder defendant in mitigation. “ ‘While Lockett and its progeny require consideration of all evidence as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’ Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr.App.1989).” Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, Slaton v. Alabama, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). “Lockett does not require that all evidence offered as mitigating evidence be found to be mitigation.” Ex parte Ferguson, 814 So.2d 970, 976 (Ala.2001), cert, denied, Ferguson v. Alabama, 535 U.S. 907, 122 S.Ct. 1208, *497 152 L.Ed.2d 145 (2002). See also Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003), cert, denied, 893 So.2d 563 (Ala.2004), cert. denied, Snyder v. Alabama, 544 U.S. 1062, 125 S.Ct. 2512, 161 L.Ed.2d 1113 (2005). “The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance.” Calhoun v. State, 932 So.2d 923, 975 (Ala. Crim.App.2005), cert. denied, Calhoun v. Alabama, 548 U.S. 926, 126 S.Ct. 2984,165 L.Ed.2d 990 (2006). Nor is the “the trial court ... required to specify in its sentencing order each item of proposed non-statutory mitigating evidence offered that it considered and found not to be mitigating.” Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), affirmed, 710 So.2d 1350 (Ala.1997), cert. denied, Williams v. Alabama, 524 U.S. 929, 118 S.Ct. 2325,141 L.Ed.2d 699 (1998).
The circuit court’s order specifically lists each statutory mitigating circumstance and found that none were present. The court then detailed the nonstatutory mitigating circumstances that had been presented by Whatley and stated:
“The murder of ‘Pete’ Patel committed by the Defendant occurred before he converted his life to Christianity and he has now turned his life over to Christ. If true, this is miraculous and commendable and may assure him everlasting life. However, the Court has its doubts as evidenced by the Defendant’s conduct since he was returned to this county. The State produced records and testimony from employees of the Mobile County Metro Jail who have witnessed and documented the Defendant’s violent outbursts while incarcerated in this facility. Some of these outbursts occurred even after Defendant supposedly converted his life to Christianity.
“The murder of Sheila Diane Over-street committed by the Defendant in the State of Texas occurred before he converted his life to Christianity. Defendant claims he has now turned his life over to Christ. However, the State produced records and testimony from the employees of the Mobile County Metro jail who have witnessed and documented the Defendant’s violent outbursts while incarcerated and after the Defendant claims he turned his life over to Christ.
“The defense argued that the Defendant was dealt a bad hand in life as a child because he came from a dysfunctional family with violence and abuse, no discipline and excessive alcohol and drug abuse. The defense argued the Defendant ‘did not have a chance from the get go.’ However, the Court heard testimony from the Defendant’s sister, Deborah Fortner, who testified during the penalty phase that she was also a product of the same environment and went on to lead a hard-working productive life as a citizen of our community.
“The defense hired Dr. [William] Alexander Morton who testified in the penalty phase of the trial that the Defendant had a long history of self-induced poly-substance abuse and depression. He testified that ‘his substance abuse and intense craving for cocaine were major factors in his behavior and thinking on the night of the murder.’ At the penalty phase of the trial, the State called C. Van Rosen, Ph.D., clinical and forensic psychologist, who testified that he evaluated the Defendant and ‘the Defendant presented a coherent account of his criminal behavior and his memories were relatively detailed’ regarding the murder of the victim ‘Pete’ Patel. It is worth noting, according to the Defendant’s own testimony, that when his own father lay dying in a hospital, the Defendant stayed by his side *498 24 hours a day for almost two weeks without consuming any drugs or alcohol.”
(C.R. 457-59.)
The circuit court’s order shows that it complied with Lockett and considered the evidence that had been presented in mitigation. “Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.” Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984), affirmed, 470 So.2d 1309 (Ala.1985), cert. denied, Harrell v. Alabama, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). The circuit court was within its discretion in failing to find the proffered evidence to be mitigating. Thus, we find no plain error.
XXIII.
Whatley next argues that it was error to find the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. Specifically, he asserts that it was error to instruct the jury on this aggravating circumstance and to find this aggravating circumstance because, he says, there was no medical testimony or evidence that the victim suffered for any appreciable period before his death.
Whatley objected to the presentation of this aggravating circumstance both before jury instructions and after the charges were given to the jury.
“Alabama appellate courts have repeatedly held that severe beatings that result in death are beyond the violence necessary to inflict death; therefore, that manner of homicide is especially heinous, atrocious, or cruel as compared to other capital murders.”
McGowan v. State, 990 So.2d 931, 1004 (Ala.Crim.App.2003), cert. denied, McGowan v. Alabama, 555 U.S. 861, 129 S.Ct. 136,172 L.Ed.2d 104 (2008).
“We have consistently held that brutal beatings that result in death meet the statutory definition of especially heinous, atrocious, or cruel. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (1997); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988). Other states have also found that brutal beatings that result in death are especially heinous. See State v. Gerlaugh, 135 Ariz. 89, 659 P.2d 642 (1983) (brutal beating lasting 15 minutes was sufficient to satisfy aggravating circumstance that the murder was committed in an especially heinous, cruel, or depraved manner); Scott v. State, 494 So.2d 1134,1137 (Fla.1986) (‘The brutal senseless beatings which the victim was forced to endure further set this crime apart from the norm of capital felonies and clearly reflect the conscienceless, pitiless and unnecessarily torturous nature of this crime.’); State v. Sepulvado, 672 So.2d 158 (La.1996).”
Blackmon v. State, 7 So.3d 397, 421 (Ala.Crim.App.2005), cert. denied, Blackmon v. Alabama, 556 U.S. 1209, 129 S.Ct. 2052, 173 L.Ed.2d 1136 (2009).
“The cruelty exercised upon [the victim] is clearly demonstrated by the nature and extent of his physical injuries. These injuries caused [the victim] intense and severe pain before he died. The physical abuse and neglect were significantly more ruthless than that required to commit murder.”
*499 Ward v. State, 814 So.2d 899, 924 (Ala.Crim.App.2000), cert. denied, 814 So.2d 925 (Ala.2001), cert. denied, Ward v. Alabama, 585 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002).
In finding this aggravating circumstance, the circuit court stated:
“Dr. Kathleen Enstice testified to over 19 pages of injuries that Mr. Patel sustained as a result of the defendant inflicting blunt force trauma to the face by way of multiple blows. She testified some of the blows to Mr. Patel’s face were inflicted when he was lying in a horizontal position. She testified that Mr. Patel was manually strangled, most likely by the hands of the defendant, and then subsequently strangled with an object being tied around his neck cutting off his air flow. She testified that it was possible Mr. Patel regained consciousness after being strangled. She further testified that Mr. Patel had scratch marks on his neck which indicated that he was alive at the time of strangulation and was attempting to pull the assailant or object away from his neck. She further stated that in her opinion ‘Pete’ Patel was alive at the time he was run over by the vehicle due to the fact that he had blood in his lungs showing he was breathing at the time. Jail informant, Scott Cook, testified that the defendant told him that after he strangled Mr. Patel, he (Patel) began choking and he had to run over him with the car to finish him off.”
(R. 452.) Whatley said in his statement to police that Patel moaned during the attack and he had to run over him with a car to finish him off. Certainly, the murder in this case, by anyone’s definition, was especially heinous, atrocious, or cruel as compared to other capital murders. This aggravating circumstance was appropriately applied in this case.
In this section of Whatley’s brief, he also argues that this aggravating circumstance is unconstitutionally vague. However, we have held otherwise:
“With respect to Minor’s constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, [that is unconstitutionally vague and overbroad] this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), affd, 779 So.2d 1288 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999), affd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim. App.1988), affd, 551 So.2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App. 1988), affd, 548 So.2d 547 (Ala.1989).”
Minor v. State, 914 So.2d 372, 437 (Ala.Crim.App.2004), cert. denied, Minor v. Alabama, 548 U.S. 925, 126 S.Ct. 2977, 165 L.Ed.2d 987 (2006). The aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital murders is not unconstitutionally vague and was correctly applied in this case.
XXIV.
As required by § 13A-5-53, Ala. Code 1975, we must address the propriety of Whatley’s capital-murder conviction and his sentence of death. Whatley was indicted for, and convicted of, murdering Pete Patel during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Whatley be sentenced to death.
*500 The record reflects that Whatley’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
The circuit court found as aggravating circumstances that Whatley had previously been convicted of a felony involving the use or threat of violence to the person, an aggravating circumstance as defined in § 13A-5-49(2), Ala.Code 1975; that the murder was committed during the course of a robbery, an aggravating circumstance as defined in § 13A-5-49(4), Ala.Code 1975; and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders, an aggravating circumstance as defined in § 13A-5-49(8), Ala.Code 1975. The circuit court found no statutory or nonstatutory mitigating circumstances. The court found that the aggravating circumstances clearly outweighed the mitigating circumstances and that a death sentence was warranted.
We have independently weighed the aggravating and the mitigating circumstances as required by § 13A-5-53(b)(2), Ala.Code 1975, and are convinced, as was the circuit court, that death was the appropriate sentence for the vicious murder that Whatley committed.
Neither is Whatley’s sentence disproportionate or excessive to penalties imposed in similar capital-murder cases. See § 13A-5 — 53(b)(3), Ala.Code 1975. “ ‘In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.’ ” Smith v. State, 795 So.2d 788, 842 (Ala.Crim.App.2000), cert. denied, 795 So.2d 842 (Ala.2001), cert. denied, Smith v. Alabama, 534 U.S. 872, 122 S.Ct. 166, 151 L.Ed.2d 113 (2001), quoting McWhorter, 781 So.2d at 330. See also Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011) (opinion on return to remand); Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004), affirmed, Ex parte Walker, 972 So.2d 737 (Ala.2007), cert. denied, Walker v. Alabama, 552 U.S. 1077, 128 S.Ct. 806, 169 L.Ed.2d 608 (2007); Gamble v. State, 791 So.2d 409 (Ala.Crim.App.2000).
Last, as required by Rule 45A, Ala. R.App. P., we have searched the record for any error that may have affected What-ley’s substantial rights and have found none.
Whatley’s conviction for murder made capital because it was committed during a robbery and his sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
WELCH, P.J., and KELLUM and JOINER, JJ., concur. WINDOM, J., recuses herself.

. This case was originally assigned to another member of this Court; it was reassigned to Judge Burke on February 19, 2011.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

.After the State and defense counsel each struck 30 prospective jurors, the clerk discovered that there were only 11 jurors remaining. All the parties agreed to put the numbers of the last two strikes for both the State and the defense in a hat and draw out the name of a juror who would sit on Whatley’s jury.

. For Batson purposes, we view the alternate jurors as having been struck. See Ashley v. State, 651 So.2d 1096, 1099 (Ala.Crim.App. 1994).

. To protect the anonymity of the jurors, we are using their initials.

. The circuit court found that the testimony of Whatley’s trial attorney concerning his thought processes during voir dire examination did not violate the “attorney-client privilege or the attorney work-product doctrine.” (Remand R. 81.)

. Although the State also said that this juror was struck because her grandfather was an alcoholic, this reason is questionable, given that the State did not use this reason to strike white jurors who indicated that they had a relative with a drinking problem.

. Alabama’s DNA database statute is found in § 36-18-24, Ala.Code 1975.

. In Hammonds v. State, 111 So.2d 750 (Ala.Crim.App.1999), affirmed, 777 So.2d 777 (Ala.2000), cert. denied, Hammonds v. Alabama, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), we held that Alabama's DNA indexing system requirement that all persons convicted of a felony or serving a sentence for a felony undergo DNA testing was constitutional.

. “Rule 614(b) of the Federal Rules of Evidence permits judges to question witnesses. A trial judge's questioning of witnesses is permissible if aimed at clarifying the evidence or managing the trial.” United States v. Davis, 285 F.3d 378, 381 (5th Cir.2002).